**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 11 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOSEPH DODGE, individually and as personal representative of the Estate of Thelma Dodge; ROCKY MOUNTAIN EQUESTRIAN CENTER, INC.; PATRICK SHANE DODGE; CONNIE DODGE; NATHAN DODGE, LESLIE DODGE, BRYAN DODGE, and PATRICK DODGE, minors, by and through their parents and next friends, Patrick Shane Dodge and Connie Dodge; YVONNE PEGARARO; NOAH WELCH, and JEREMIAH WELCH, minors, by and through their parent and next friend Yvonne Pegararo; RHONDA BUTSON; DANIEL SLANOVICH; GUS SLANOVICH; CHANDLER CREEK COMPANIES; DONALD LUNA; SONJA LUNA; BRETT LUNA; JAMES BLUE, individually and as personal representative of the Estate of Virginia Blue; EDNA BLUE; RUSSELL JEWETT; BONITA JEWETT; SHIRLEY BICKETT; JOHN BICKETT; RICHARD JANITELL; RALPH JANITELL; JOHN PINELL; EMMA PINELL; JAMES L. TREAT; ASPEN TRUST; NARD CLAAR; SARA CLAAR; RUTH QUICK JOHNSON; MIKE HADLEY; KATHERINE HADLEY; LINDA JOHNSON; ALICIA JOHNSON and BLAINE JOHNSON, minors by and through their mother and next friend Linda Johnson; JULIE ANN WRIGHT; JENNIFER WRIGHT and NICOLE

WRIGHT, minors by and through their mother Julie Ann Wright, and CANON FARMS TRUST,

   Plaintiffs,

DESIREE CHRYSLER; DANIEL CHRYSLER; AUGUST CHRYSLER, and CLAYTON CHRYSLER, minors, by and through their parents and next friends, Desiree Chrysler and Daniel Chrysler; NORMAN PLATT, individually and as personal representative of the Estate of Dorothy Platt; BRUCE HADLEY; VIRGINIA HADLEY; JACK HADLEY; SHAYLEE HADLEY; KIM MYERS; SID MYERS; CASEY MYERS and CHAD MYERS, minors by and through their parents and next friends Kim Myers and Sid Myers,

   Plaintiffs - Appellees and
   Cross - Appellants,

v.

COTTER CORPORATION,

   Defendant - Appellant and
   Cross - Appellee.

Nos. 99-1178, 99-1199

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 91-Z-1861)**

- 2 -

John L. Watson (Marsha M. Piccone, W. David Byassee, and Mark T. Barnes with him on the briefs), Freeborn & Peters, Denver, Colorado, for Defendant-Appellant.

Suzelle M. Smith (Don Howarth with her on the briefs), Howarth & Smith, Los Angeles, California, for Plaintiffs-Appellees.

---

Before **BALDOCK**, **PORFILIO**, and **MURPHY**, Circuit Judges.

---

**PORFILIO**, Senior Circuit Judge.

---

In 1958, Cotter Corporation, a subsidiary of the Commonwealth Edison Company of Illinois, began operating a uranium mill near Canon City, Colorado, extracting uranium from ore by an alkaline leach process. The two types of waste produced by that process, tailings, dust-like particles of ore, and raffinate, liquid recovered from the uranium extraction solutions, eventually contaminated the area, including the semi-rural community of Lincoln Park, and triggered its designation as a Superfund site on the EPA's National Priority List. Subsequently, some five hundred Lincoln Park residents filed an action under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675, the Price-Anderson Act, 42 U.S.C. § 2210(n)(2), and Colorado law alleging Cotter's negligent operation of the mill caused damage to their health and property. After class certification was denied, eight plaintiffs, selected for the first trial, convinced a jury Cotter was negligent in operating the mill but

failed to establish its negligence caused their exposure to hazardous materials which required future medical monitoring.

Now before us is a second group of fourteen plaintiffs who, armed with the first jury's finding of negligence, established Cotter's negligence caused their physical injuries and were awarded monetary damages. Cotter assails the judgment on numerous grounds, and plaintiffs cross-appeal. Of the many issues Cotter raised, one predominates. After careful review of this ponderous record, we conclude the district court incorrectly applied the doctrine of offensive collateral estoppel, precluding Cotter from litigating the issue of negligence. For the single issue remaining in plaintiffs' cross-appeal, whether the district court properly granted summary judgment dismissal of their fear of cancer claim, we reject the contention of error. We, therefore, reverse the judgment and remand the action for retrial.

## I. Background

The Cotter uranium mill (the Mill) occupies a 640-acre site in south central Colorado, two and a half miles south of Canon City. Lincoln Park, an unincorporated area, is a mile and a half north of the Mill. The Arkansas River borders Lincoln Park's northern rim while Sand Creek and the DeWeese Dye Ditch angle across its southern perimeters. During its years of operation crushing ore into "yellowcake," a concentrated uranium,[1] dry tailings were carried off-site by winds. Liquids, recovered from the

---

[1]The Mill produced and shipped the yellowcake to nuclear power plants in
(continued...)

- 4 -

uranium extraction solutions and stored in unlined ponds, leached into groundwater beneath the Mill and flowed north toward Lincoln Park along the Sand Creek channel.

As early as 1959, the Atomic Energy Commission (AEC), which then regulated uranium production operations at the Mill, notified Cotter of violations of the conditions of its license. Annual violations of AEC standards of Protection Against Radiation occurred through 1968 when the state of Colorado (the State) took over responsibility from the AEC for licensing radioactive materials. In the meantime, Cotter's production rose from 50 tons of uranium a day in 1958 to 1200 tons a day in 1979, when the State relicensed the Mill.

In an effort to clean up the site, both the EPA and the Colorado Department of Public Health and Environment (Department) targeted the Mill's unlined storage ponds as a primary source of the proliferation of such hazardous substances as uranium, molybdenum, thorium, radium, selenium, arsenic, and lead. By 1981, Cotter had closed eight unlined ponds and constructed two new tailings facilities sealed with an eighteen inch hypalon liner overlaid with six inches of clay.[2] Later, Cotter added a clay barrier to the Sand Creek Dam to prevent water flow from the Mill into Lincoln Park. Despite these efforts, state inspections would reveal tears in the ponds' linings or violations of air

---

[1](...continued)
northern Illinois owned by Commonwealth Edison, Cotter's parent company.

[2]These ponds, an integral part of the Mill operation and site, are vast; one covers 91 acres; the other 44 acres.

emissions standards. Although Cotter ceased operating the Mill in 1987, the Department projected the clean-up would not be completed until 2012.[3]

In 1983, after persistent and unabated violations, the State sued Cotter in federal court for damages to natural resources and clean-up of the contamination. *State of Colorado v. Cotter Corp.*, Case. No. 83-C-2389. In 1988, the parties settled the matter by a Consent Decree which provided a Remedial Action Plan (Plan). The Plan required the creation of the Human Health Risk Assessment Panel (Panel) which prepared a report in 1991 on the Lincoln Park Superfund Site evaluating the health risks to the surrounding populations from the Mill's off-site chemical releases. The Panel quantified exposures to Mill-related chemicals in air, surface water, sediment, ground water, soil, and different types of locally raised food; measured the toxicity of the exposures; and assessed the possible health risks based on those evaluations. The Panel concluded "risks to humans were generally low, especially when judged in comparison to natural 'background' levels of mill-related metals in the environment." However, the Panel excepted from that conclusion a possible health concern in drinking ground water "because of the presence of molybdenum (and, to a lesser extent, uranium) in the water."

## II. *Boughton* Trial

In 1989, some five hundred residents and property owners living in Lincoln Park, Brookside, a community east of the Mill, and Canon City (collectively, Lincoln Park)

---

[3]Cotter planned to resume operations in 1999.

- 6 -

filed suit in federal court. In an amended complaint, Lincoln Park plaintiffs requested statutory relief under CERCLA and sought damages exceeding $350 million for Cotter's negligence, strict liability, nuisance, willful and wanton conduct, outrageous conduct, trespass, and absolute liability. In addition, plaintiffs requested damages and injunctive relief for medical monitoring. Although plaintiffs sought class certification, the district court held the action was not maintainable under Fed. R. Civ. P. 23(a) because individual issues predominated over common issues of law or fact. The parties then agreed to the selection of eight bellwether plaintiffs (***Boughton*** plaintiffs) for the first trial.

The ***Boughton*** plaintiffs did not allege any physical illnesses or injuries. Instead, they claimed they and their property were exposed to hazardous substances from the Cotter Mill and sought damages for trespass to real estate; damages for nuisance; and medical monitoring based on negligence.

At the close of the evidence after a twenty-three day trial, the court framed the issues for the jury to decide with the parties' claims and defenses. It instructed the jury, in part, "The plaintiffs claim that they and their properties have been exposed to radioactive and hazardous contamination as a result of Cotter's milling operation. They assert that this contamination has significantly increased their risk of health problems, and that they are therefore entitled to medical monitoring." Although the ***Boughton*** plaintiffs did not claim their exposure to hazardous substances caused physical injuries, they

contended medical monitoring of the possible adverse effects of the exposures was required. For Cotter's theory of defense, the court told the jury,

> Cotter admits that its operations have caused some ground water contamination by radioactive and molybdenum materials in certain limited areas, but Cotter states that the contamination has been and is now being cleaned up pursuant to a government-supervised Remedial Action Plan. Cotter claims that it did not engage in any conduct nor breach any legal standard for which it would be liable to plaintiffs.

The court then instructed the jury on negligence tracking the language of the Colorado Civil Jury Instructions. Instruction 25 provided:

> The plaintiffs claim that Cotter was negligent, and therefore plaintiffs are entitled to medical monitoring.

> Negligence means a failure to do an act which a reasonably careful person or company would do, or the doing of an act which a reasonably careful person or company would not do, under the same or similar circumstances to protect others from bodily injury or property damage.

> Even if statutes, ordinances or regulations govern the actions of a person or corporation, that person or corporation must use reasonable care under the particular circumstances and conditions prevailing.

> Reasonable care is that degree of care which a reasonably careful person or company would use under the same or similar circumstances.

> The degree of care that constitutes reasonable care increases in proportion to the degree of risk associated with the particular activity.

Instruction 26 set forth each of the elements the jury had to find for the ***Boughton*** plaintiffs to succeed on the claim of negligence for medical monitoring. It stated:

> In order for any particular plaintiff to recover from Cotter on his or her negligence claims for medical monitoring, you must find that all of the following have been proved as to that particular plaintiff:

- 8 -

1.  that the particular plaintiff was significantly exposed to a proven hazardous substance;

2.  that Cotter was negligent;

3.  that Cotter's negligence was a cause of that plaintiff's exposure;

4.  that as a result of that exposure, the particular plaintiff suffers a significantly increased risk of contracting a serious latent disease;

5.  that the significantly increased risk makes periodic diagnostic medical examinations reasonably necessary; and

6.  that monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

The determination of which of the plaintiffs, if any, are entitled to medical monitoring must be made independently for each plaintiff.

If you find that a particular plaintiff has proved all six of these propositions by a preponderance of the evidence, then your verdict must be for that plaintiff on that plaintiff's negligence claim for medical monitoring.

After five days of deliberation, the jury returned separate special verdict forms[4] for each plaintiff making a claim of negligence for medical monitoring, trespass, and nuisance. There was no separate verdict form on which the jury found Cotter was negligent under Instruction 25. However, on each of the plaintiffs' "Negligence claim for medical monitoring Special Verdict Form," the jury was asked whether Cotter was negligent and found Cotter negligent. For each ***Boughton*** plaintiff the jury also found there was no exposure to hazardous substances making reasonably necessary future medical monitoring or testing.[5] After the verdicts were read, the jury asked the court, "[C]ould you explain about the other 500 plaintiffs? We promise we never considered them during deliberation." The court told them because it was impossible to try such a large case, it was hoped that an initial bellwether trial might provide some "indication

---

[4]The special verdict form stated:

1. Was [plaintiff] significantly exposed to a proven hazardous substance? (Yes or No)
2. Was defendant Cotter negligent? (Yes or No)
3. Was Cotter's negligence, if any, a cause of [plaintiff's] exposure, if any? (Yes or No)
4. As a result of his exposure, if any, does [plaintiff] suffer a significantly increased risk of contracting a serious latent disease? (Yes or No)
5. Does this significantly increased risk, if any, make periodic diagnostic medical examinations reasonably necessary for [plaintiff]? (Yes or No)
6. Do monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial for [plaintiff]? (Yes or No)

[5]Three plaintiffs prevailed on nuisance claims; six succeeded on their claims of trespass although only four were awarded monetary damages. No non-economic or exemplary damages were awarded.

- 10 -

helpful" to resolve the remaining plaintiffs' cases. The **Boughton** plaintiffs' appeal of the denial of class certification and other issues was later rejected. **Boughton v. Cotter Corp.**, 65 F.3d 823, 828 (10th Cir. 1995). Cotter did not cross appeal.

### III. *Dodge* Trial

In the second trial, fourteen plaintiffs (collectively here, **Dodge**), members of four Lincoln Park families, filed an amended complaint which was virtually identical to the complaint in **Boughton I**. Although the years of the alleged negligence are slightly different,[6] the **Dodge** complaint alleged verbatim Cotter's negligence rested on its breach of the "duty to properly control and contain the radioactive and/or hazardous materials," and "to prevent said radioactive and/or hazardous materials and constituents from being released into the air and allowed to migrate or leak into the groundwater, surface water, rivers and soils in the vicinity." Further, the complaints alleged the breach of the duty to control and contain allowed "radioactive and/or hazardous materials to be released into the air and allowing said radioactive material and constituents to migrate or leak into the groundwater, surface water, rivers and soil in the vicinity." The complaint listed the same eleven "negligent acts and/or omissions" found in **Boughton**.[7]

---

[6]**Boughton I** alleged 1958-present, and **Dodge** 1958 -1991. Although the difference is readily explainable, the first verdict did not indicate the time period or dates of Cotter's negligence.

[7]Paragraph 50 of both complaints stated:

These releases and contamination of the air, ground water, surface water,

(continued...)

- 11 -

rivers and soil in the vicinity of the facility and property were proximately caused and their results aggravated by the negligent acts and/or omissions of the Defendants including, but not limited to, the following:

(A) permitting the emissions, releases and leaks of radioactive and/or hazardous materials from the facility and property to occur;

(B) failing to determine where and how the emissions, releases and leaks of radioactive and/or hazardous materials occurred and in failing to correct the problems to prevent further leakage and emissions;

(C) failing to provide adequate containment of the radioactive and/or hazardous materials;

(D) failing to provide adequate air, surface water, ground water, rivers and soil sampling and/or monitoring to detect releases of radioactive and/or hazardous materials;

(E) failing to take proper measurements of particle sizes and emissions;

(F) failing to test incoming ores adequately for the presence of hazardous or toxic materials;

(G) failing to timely and adequately warn or otherwise notify Plaintiffs of such releases and contamination and the effects thereof;

(H) failing to take timely and adequately remedial actions to contain and clean up such contamination and to prevent recurring releases;

(I) failing to properly train and supervise their employees to insure that the necessary safeguards and procedures would be followed in the event that any emissions, releases or leaks of radioactive and/or hazardous materials from the facility and property might occur;

(J) failing to comply with applicable Federal and State laws, regulations, licenses or orders;

(continued...)

The ***Dodge*** plaintiffs moved prior to trial for partial summary judgment on the issues of negligence, trespass, and nuisance, contending those issues were settled in ***Boughton***, and Cotter should be collaterally estopped from litigating them in the second trial. The ***Dodge*** plaintiffs represented the district court had "streamlined resolution of issues common to all Lincoln Park residents by designating eight Bellwhether [sic] plaintiffs in Boughton." They urged because the ***Boughton*** jury finally adjudicated "the ultimate issues of negligence, trespass and nuisance . . . [a]pplication of collateral estoppel to these issues is the logical follow-up to the Court's prior decisions, and accomplishes avoiding the unnecessary expense of multiple litigation of the same issues, conserving judicial resources, and encouraging reliance on judicial action." The ***Dodge*** plaintiffs relied on ***Parklane Hosiery Co. v. Shore***, 439 U.S. 322 (1979), contending they had satisfied the four conditions for the offensive use of collateral estoppel.

Cotter strenuously resisted the motion, arguing that despite the virtually identical complaints, the first verdict was not clear, fully obscuring which of the eleven asserted grounds of negligence was found; which standard of care was relied upon over the forty-year period of operation; and what period of time Cotter acted negligently toward each

---

[7](...continued)
    (K) being negligent in the construction and implementation of remedial measures for containing releases from the tailing ponds and operating facilities.

plaintiff.   Key to its argument, it contended, was labeling the **Boughton I** verdict a

"special verdict," when,  in fact, it was a general verdict.

At the hearing on the motion,[8] **Dodge** plaintiffs argued that because collateral

estoppel is an issue-specific doctrine, its offensive use would insulate only the issue of

negligence, the breach of the duty of care, leaving questions of proximate cause,

damages, and affirmative defenses for the parties to establish.  Cotter countered

instructing the jury that the court had already found it was negligent was overwhelmingly

prejudicial in the face of the **Dodge** plaintiffs' claims for punitive damages.  Instead,

Cotter urged the district court to instruct the jury that judgment was entered in its favor

against plaintiffs for dismissal of the negligence claim for medical monitoring,

eliminating its need to introduce medical monitoring or physical injury testimony.  Cotter

relied on **Pomeroy v. Waitkus**, 517 P.2d 396 (Colo. 1973), in which the Colorado

Supreme Court held the application of collateral estoppel was not appropriate to prevent

the same defendant in a second trial from litigating affirmative defenses not raised in the

first trial.

After hearing the arguments, the court ruled the "pure issue of negligence" had

been decided and would not be relitigated, emphasizing the ruling did not affect liability,

proximate cause, the negligence of another party, or willful and wanton conduct, all of

---

[8]The hearing addressed only the issue of negligence, the court having already
denied the motion on the issues of trespass and nuisance.

which "certainly is going to be litigated." At the close of five weeks of trial in **Dodge**, the court then instructed the jury,

> The Court already has determined that defendant was negligent. The Court's determination that the defendant was negligent must not influence you in determining any of the remaining issues in this case. As you will be instructed further at the end of this case, a finding of negligence is not a finding of liability. You must still determine whether defendant's negligence caused any of the injuries or damages alleged by plaintiffs, whether defendant's conduct constituted gross negligence, and other issues that will affect the liability, if any, of the defendant.

The jury returned verdicts in favor of plaintiffs and awarded damages for physical injuries and diminution of the value of their property on that same day of deliberations.

## IV. Collateral Estoppel

Cotter persists in contending the court improperly afforded **Dodge** plaintiffs the benefit of a preclusive factual finding which overwhelmingly prejudiced its ability to defend the second action. Although Cotter overlays the primal question of its negligence with the issue of causation and damages[9] and ultimately urges we adopt a per se rule that application of collateral estoppel is inappropriate in negligence cases, we must agree that whatever the plaintiffs, trials, and verdict forms were labeled, it is not possible to know

---

[9]Cotter also confuses the analysis under Fed. R. Civ. P. 23 with that for determining whether the first trial resolved the question of negligence. The district court fully recognized collateral estoppel is an *issue* preclusion doctrine and did not confound it with questions of the various types of relief sought which formed the basis of the denial of class certification. Further, Cotter's assertion **Dodge** plaintiffs "could have opted to be plaintiffs in *Boughton*" is specious, defying the record of opposing counsels' meeting with the United States Magistrate Judge and selecting the plaintiffs for each case.

the compass of the **Boughton I** jury's finding of negligence. We therefore hold the district court erred in giving that particular issue preclusive effect.

We review the district court's entry of summary judgment barring claims under the doctrine of collateral estoppel de novo, construing the record in the light most favorable to the non-moving party and drawing all inferences in that party's favor. **Gonzales v. Hernandez**, 175 F.3d 1202, 1204 (10th Cir. 1999) (citation omitted); **Meredith v. Beech Aircraft Corp.**, 18 F.3d 890, 894 (10th Cir. 1994). We also look to federal law to reach our conclusion. **Orjias v. Stevenson**, 31 F.3d 995, 1010 (10th Cir. 1994). That is, although the issue precluded, negligence, is a matter of state law, the preclusive effect given in federal court to a prior federal judgment is subject to federal law. **Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation**, 975 F.2d 683, 687 (10th Cir. 1992).

"When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." **Ashe v. Swenson**, 397 U.S. 436, 443 (1970). **Parklane Hosiery** sanctioned the offensive use of collateral estoppel, permitting a plaintiff to "foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." 439 U.S. at 326 n.4. Under **Parklane**, if the components of collateral estoppel are satisfied, its benefits of economizing judicial resources and lessening the burdens of relitigating identical issues already decided, would be afforded a non-mutual plaintiff provided defendant had previously had a full and fair opportunity to litigate the

issue.  Importantly, the decision to eliminate the mutuality requirement to permit the plaintiff such a windfall was placed within the trial court's "broad discretion."  *Id.* at 331.[10]

In this Circuit, application of collateral estoppel requires:  (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.  *Murdock*, 975 F.2d at 687 (citations omitted).  The record copiously establishes three of the four elements.  However, the *Boughton I* jury instructions, our blueprint for determining the parameters of the first jury's verdict, sabotage the existence of the first element.

As we previously noted, the *Boughton I* complaint contained eleven specific allegations of negligence, providing detail to the preceding three paragraphs alleging Cotter's duty, breach of the duty, and "negligent acts and/or omissions of the Defendants, including but not limited to" the catalog of specific negligent acts.  Nonetheless, the first jury was simply instructed, in part, "negligence means a failure to do an act which a

---

[10]Assuredly, we are cognizant of the trial court's broad discretion and long involvement in the two cases.  Neither, however, trumps the legal elements of the doctrine.  Although the court and counsel may know how an issue was resolved, that understanding cannot be fully superimposed onto the second jury without a clear indication of what, in fact, the first jury decided.

reasonably careful person or company would do . . . ." The jury was not instructed on the specific duty allegedly breached. Nor did the verdict form specify what negligent act formed the basis of the general finding of negligence. Counsel for *Dodge* plaintiffs would fill the gap by stating that seven of the eleven specific counts of negligence "explicitly refer to releases and the other 4 (E, F, I, and J) clearly encompass them." Thus, she urges the *Boughton* trial was about the release of contaminants and adds "on the special verdict forms, the jury found that Cotter was negligent in answering questions about medical monitoring." However, the *Boughton* trial did not resolve whether the same released contaminants in whatever directions or forms or times amounted to negligent conduct as to each *Dodge* plaintiff with a clear indication the parties intended to be bound for all future proceedings by that finding.

Moreover, although seven of the eleven specific allegations may refer in some respect to releases, another alleges Cotter failed to test incoming ores; a second that Cotter failed to provide a timely and adequate warning; and a third that Cotter failed to properly train and supervise its employees. Nonetheless, our concern is not that the jury did not find negligence on one or more specific allegations, but that the general finding under the negligence instruction fails to identify what the jury found sustained by the evidence. Thus, we cannot say as a matter of law the issue decided by the first jury is identical to the issue in controversy in this case. To attempt to cure that defect by labeling

- 18 -

the first trial a "bellwether,"[11] or citing the pretrial order is to no avail.  The ***Boughton* I** jury's verdict does not assure an unassailable finding that plaintiffs met their burden of proof that Cotter breached a specific duty.

At oral argument, ***Dodge*** plaintiffs' counsel represented the ***Boughton*** trial court clearly indicated it would try the common issues for however many trials were necessary. In response to the panel's request for every citation to the record documenting the trial court's express intention to try the issue of negligence as if it were an exemplar or class action forum, ***Dodge*** counsel submitted a supplemental appendix including the ***Boughton*** complaint and jury instructions; pretrial orders indicating the presence of the issue of negligence; the special verdict forms; and a ***Dodge*** jury instruction.  None of the citations expressly establishes the parties were on notice the first jury would decide the issue of negligence as a matter of law for all succeeding trials.  For example, ***Dodge*** counsel prefaces inclusion of  **Boughton** jury instruction 3, in part, to establish "the 8 Cases Were Bellwether Cases or Sample Cases Because It Would be Impractical to Try the 500 ***Boughton*** cases Separately."  However, the jury instruction stated, after listing the names of the parties:

> In actuality, more than 500 plaintiffs have filed this action.  Because it would not be practical to conduct more than 500 separate trials, or even one trial involving more than 500 plaintiffs, the parties and the Court decided to designate certain plaintiffs as sample plaintiffs, or "bellwether plaintiffs,"

---

[11]The dictionary states a bellwether is "one that takes the lead."  Webster's New International Dictionary (3d ed. 1993).

and to *limit* this trial to their claims . . . .  You should make no inferences from the Court's selection, and you are not to speculate or consider the extent to which these plaintiffs' claims *may or may not represent those of the remaining plaintiffs, since those claims are not before you.*

(italics added).  Thus, there is no indication in the record before us that the parties understood the first trial would decide specific issues to bind subsequent trials.

In contrast, we would note Instruction 14 on trespass in **Boughton I,** an issue the district court did not collaterally estop from retrial.  That instruction read:

For a plaintiff to recover on a claim of trespass, each of the following elements must be present:

    1.  that plaintiff holds title or a possessory interest in the property at the time of the alleged trespass;

    2.  the defendant sets in motion a force which, in the usual course of events, will damage that plaintiff's property; and

    3.  any entry upon, under or above the surface of that plaintiff's real estate without permission or invitation.

    If you find that a particular plaintiff has failed to prove any of these propositions by a preponderance of the evidence, then your verdict must be for Cotter on that plaintiff's trespass claim.

    On the other hand, if you find that a particular plaintiff has proved all three of these propositions by a preponderance of the evidence, then your verdict must be for that plaintiff on that plaintiff's trespass claim.

The instruction told the jury it must find each element on a claim of trespass by a preponderance of the evidence, a standard of proof explained in Instruction 4.  Despite the greater specificity of the instruction, the trial court refused to allow those findings to collaterally estop Cotter from proving trespass in **Dodge**.  Counsel, however, further

argues because the ***Boughton I*** jury found "in favor of each Plaintiff on their claims for trespass, so clearly the Boughton jury found that Cotter had released contaminants into the Lincoln Park area." However, we cannot transpose a general finding that substances were released under another theory of recovery to bar Cotter from contesting the range of its conduct and duties as alleged in a second action to determine its liability.

To place our concerns in a larger context, we would note ***In re TMI Litigation***, 193 F.3d 613 (3d Cir. 1999), which involved the personal injury claims of over 2,000 area residents arising out of the 1979 nuclear reactor accident at Three Mile Island. In that case, the district court adopted a plan for a "mini-trial" suggested by plaintiffs. The plan called for an "initial mini-trial of the claims of twelve 'typical' plaintiffs, half chosen by plaintiffs and half chosen by defendants." *Id.* at 627. The mini-trial would focus on plaintiffs' "ability to demonstrate that they were exposed to doses of radiation sufficient to cause their neoplasms." *Id.* at 623. The parties then clearly agreed to proceed on an "All Plaintiffs" basis, extending the results of the mini-trial to bind non-participants. "A contrary intention or result would obviate all benefits of having consolidated the many separate actions," the district court stated. *Id.* at 628.

To establish causation, plaintiffs relied on several experts who testified about the dose of radiation released into the environment and then correlated the dose to plaintiffs' injuries. When the district court excluded the dose exposure testimony under ***Daubert***, it then held its ***Daubert*** ruling would bind all of the other non-trial plaintiffs. Analyzing

this ruling under Fed. R. Civ. P. 42(b), the basis for consolidating all of the cases, the Third Circuit found applying the summary judgment ruling from the trial plaintiffs to the non-trial plaintiffs implicated substantive rights protected by the Seventh Amendment and improperly extended the doctrine of collateral estoppel/issue preclusion. *Id.* at 725-26. Despite the array of arguments for efficiency and streamlining the trial process in the face of a single nuclear accident, the Third Circuit reversed the extension of summary judgment applied to non-trial plaintiffs.

*TMI* must remind us to focus on what was actually litigated and who should be bound and benefit from those results. That concern must override arguments about inconsistent results and time-consuming relitigation of the same issue. If the parties intended to bind subsequent litigation with the results of prior test trials, the record must clearly memorialize that agreement. Their failure to do that here leaves important substantive rights at the mercy of trial tactics.

We therefore reverse the district court's grant of partial summary judgment, fully mindful of the impact of the conclusion on this already protracted and voluminous case. If **Boughton I** was to have been the test case in plaintiffs' effort to establish this toxic tort, greater care to assure the jury was properly instructed and the verdict forms were clear was essential to establish results impervious to relitigation.[12]

_____

[12]Obviously, this conclusion moots the remaining issues raised in the cross-appeals. However, because the question of expert testimony is likely to recur, we would be remiss not to indicate our concern that the district court vigilantly make detailed

(continued...)

## V.  Fear of Cancer – 99-1199

The district court granted Cotter's motion for summary judgment on ***Dodge***

plaintiffs' claim for damages for emotional distress caused by their increased fear of

cancer.  In their cross-appeal, ***Dodge*** plaintiffs contend the ruling was error.  Because the

ruling represents a final judgment appropriate for review under 28 U.S.C. § 1291, it,

unlike the other issues mooted by our disposition, remains viable.  We review the district

court's order granting summary judgment de novo, applying the same standard of Fed. R.

Civ. P. 56(c) as did the district court.  ***Roe v. Cheyenne Mountain Conference Resort,***

***Inc.***, 124 F.3d 1221, 1235 (10th Cir. 1997).  In this process, we draw all inferences in the

non-movant's favor and analyze Colorado law afresh.  ***Mares v. ConAgra Poultry Co.***,

971 F.2d 492, 496 (10th Cir. 1992).

To survive summary dismissal of this claim, ***Dodge*** plaintiffs argued their

exposures to hazardous materials caused a range of physical conditions: bony growths,

cataracts, headaches and irritability, to name a few.  They contended these physical

injuries met a threshold for recovery under ***Towns v. Anderson,*** 579 P.2d 1163, 1164-65

---

[12](...continued)
findings to fulfill the gatekeeper role crafted in ***Daubert v. Merrell Dow***
***Pharmaceuticals***, ***Inc.***, 509 U.S. 579 (1993).  Given the novelty of the medical causation
theory here linking exposure to molybdenum with osteoarthritis and bony exostoses, it is
essential that by specific findings of record the trial court assures the expert testimony
offered by both sides is relevant and reliable, and the "particular opinion is based on
valid reasoning and reliable methodology." ***Kannankeril v. Terminix Int'l, Inc.***, 128
F.3d 802, 806 (3d Cir. 1997).  Finally, all outstanding motions are denied as moot.

(Colo. 1978), which abolished the physical impact requirement in negligence cases for emotional distress and permitted a plaintiff who is subjected to an unreasonable risk of bodily harm because of another's negligence to recover upon proof of "the internal operation of fright or other emotional disturbance." *Id.* at 1164, quoting Restatement (Second) of Torts § 436(2). Having met this requirement with the evidence of an array of manifestations of physical injuries, *Dodge* plaintiffs, relying on *Boryla v. Pash*, 960 P.2d 123 (Colo. 1998), then contended Colorado law recognized their right to recover damages for their resulting objective fear of developing cancer.

The district court rejected the argument, observing *Dodge* plaintiffs offered no evidence of an objectively reasonable chronic, continuing physical manifestation to support their fear of an increased risk of cancer as required by *Towns* and *Boryla*.[13] *Dodge* plaintiffs now argue the court misapplied Colorado's "'physical impact' rule, which gives inference to the genuineness of Plaintiffs' fears so as to permit the jury to consider damages." We disagree.

In *Boryla*, plaintiff sought non-economic damages for emotional distress including the fear of an increased risk of the recurrence of her cancer as a consequence of her physician's failure to promptly diagnose her breast cancer. 960 P.2d at 123. Reversing the Court of Appeals' granting defendant a new trial, the Colorado Supreme Court rested

---

[13]At the continued hearing on the motion on July 16, 1998, the court stated, "I doubt if we're going to have any claims for fear of cancer. I just don't see that we have sufficient material or sufficient showing for that."

its discussion on what it believed was a clear distinction between fear of cancer cases arising from a medical malpractice setting and those involving toxic torts.[14]  It stated, "In cases where the plaintiff demonstrates that her cancerous condition physically worsened as a result of the delayed diagnosis, the plaintiff has demonstrated a sufficient physical injury to permit the recovery of emotional distress damages."  *Id*. at 128.  In contrast, the court noted a toxic tort case required a different standard because "the plaintiff has yet to experience the onset of cancer," *id*., but believes the particular exposure makes him vulnerable to that increased risk.[15]

The Colorado Supreme Court concluded, "For these reasons, traditional negligence principles which focus on proximate cause as well as the reasonableness of the plaintiff's

---

[14]The court cited the discussion in ***Potter  v. Firestone Tire & Rubber Co.***, 863 P.2d 795 (Cal. 1993), which recognized significant policy concerns about the "staggering" impact of "an unrestricted plaintiff class" with fears of cancer.   In those cases, the California court held, the jury may consider whether "it is more likely than not that the plaintiff will develop the cancer in the future due to the toxic exposure," as a threshold for recovery.  ***Id.*** at 816.

[15]Defendant physician relied on ***Potter***, which set forth a higher standard for recovery for fear of cancer damages in toxic tort cases, requiring "in the absence of a present physical injury or illness, damages for fear of cancer may be recovered only if the plaintiff pleads and proves that (1) as a result of the defendant's negligent breach of a duty owed to the plaintiff, the plaintiff is exposed to a toxic substance which threatens cancer; and (2) the plaintiff's fear stems from a knowledge, corroborated by reliable medical or scientific opinion, that it is more likely than not that the plaintiff will develop the cancer in the future due to the toxic exposure."  ***Id.*** at 816.  Defendant sought to import this "more likely than not" standard into his medical malpractice case.

fear are sufficient to evaluate fear of cancer claims in medical malpractice claims." Thus, *Boryla* was a medical malpractice case, and the court expressly limited its analysis and holding to that arena. *Id.*

*Dodge* plaintiffs, however, would extend the analysis to embrace their toxic tort claim, equating the manifestation of certain acute conditions with a permanent objective injury leading to an increased risk of cancer. In the absence of any indication the Colorado Supreme Court would permit such an expansion, we decline to do so. Nor is it necessary here. At a minimum, *Dodge* plaintiffs failed to set forth any evidence that they suffer from a chronic objective condition caused by their increased risk of developing cancer to permit their recovery for emotional distress damages. Although counsel would sweep every physical manifestation plaintiffs alleged under this mantle to satisfy *Boryla*, its efforts are misplaced. Summary judgment was therefore appropriate on the claim.

We therefore **REVERSE** and **REMAND** the case for a new trial. However, we **AFFIRM** the order granting summary judgment on the fear of cancer claim.