**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 30 2001**

**PATRICK FISHER**
**Clerk**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JEANNE HARRISON,

      Plaintiff-Counter-Defendant-
      Appellee,

v.

EDDY POTASH, INC., a New Mexico
corporation,

      Defendant-Counter-Claimant-
      Appellant,

and

ROBERT L. BROWN,

      Defendant-Counter-Claimant.

No. 00-2221

---

**Appeal from United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-94-691-JP)**

---

W.T. Martin, Jr., Law Offices of W.T. Martin, Jr., P.A., Carlsbad, New Mexico,
for the appellant.

Floyd D. Wilson (Richard D. Barish with him on the brief), McCary, Wilson &
Pryor, Albuquerque, New Mexico, for the appellee.

---

Before **SEYMOUR, GIBSON** ,[*] and **BRISCOE,** Circuit Judges.

---

**BRISCOE** , Circuit Judge .

---

Defendant Eddy Potash, Inc., (EPI) appeals from the district court's entry of partial summary judgment, as well as the district court's final judgment after trial, in favor of plaintiff Jeanne Harrison on her claim of Title VII sexual harassment. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

The relevant underlying facts of this case were set forth in detail in our opinion in Harrison v. Eddy Potash, Inc., 112 F.3d 1437 (10th Cir. 1997) (Harrison I):

> Plaintiff is a resident of Carlsbad, New Mexico. Defendant Eddy Potash, Inc., is a New Mexico corporation doing business in Eddy County, New Mexico. Defendant Robert L. Brown is a supervisor employed by Potash. Plaintiff began working for Potash as an underground potash miner in May 1992 and was the only female working with a crew of approximately 30 men [and was one of only two women miners in the entire operation]. Brown, who worked as the underground shift foreman, was plaintiff's supervisor and was in charge of delegating duties and assigning work to plaintiff. According to plaintiff, Brown was the first person she was required to call if she was sick or wanted to take vacation. Brown was also involved in the disciplinary process.
> The miners at Potash had a "buddy system" where each miner was assigned a "buddy" and each set of "buddies" worked together in

---

[*] The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

a section of the mine away from other members of his or her crew. If a miner was not assigned a "buddy" on a particular shift, he or she was designated the "extra person" and was typically assigned to perform miscellaneous duties.

On May 4, 1993, Brown approached plaintiff in an isolated portion of the mine and attempted to kiss her on the mouth. She "pushed him away and told him he was crazy and to get the hell out of there." On the following day, Brown ordered plaintiff to leave her work station and accompany him to an abandoned unlit section of the mine to look for empty oil barrels he had allegedly previously noticed. After driving around the mine for awhile, Brown stopped the vehicle and walked around to the side where plaintiff was sitting. He tried to kiss plaintiff, to put his hands on her breasts and between her legs, and to unzip her pants. At the same time, Brown made various sexually suggestive comments to plaintiff, including asking her if she wanted to have intercourse or oral sex. Plaintiff pushed Brown away and said "No" to each question. Brown "unbuttoned his pants and exposed his penis, put [plaintiff's] hand on his penis, and he ejaculated." Brown then drove plaintiff back to the section of the mine where she normally worked.

On May 15, 1993, plaintiff was working with her "buddy" to fix a broken machine. Brown arrived where they were working and ordered plaintiff to accompany him to the shop to look for a part for the machine. Before arriving at the shop, Brown stopped the vehicle in an unoccupied section of the mine, walked around to plaintiff's side of the vehicle, and again attempted to kiss her, to touch her, and to unzip her pants. Plaintiff repeatedly told Brown "No." Brown started walking back to his side of the vehicle, but turned around and returned to where plaintiff was sitting. He unzipped his pants and said, "'Well, at least I can be happy.'" He then forced plaintiff to masturbate him. Brown then drove plaintiff to the shop and ordered the mechanic to drive her back to where she had been working.

On May 24, 1993, plaintiff was working a "graveyard" shift and was designated as the "extra person." Brown ordered her to accompany him to a section of the mine where they were experiencing a high methane gas reading, stating they needed to check the readings and make sure the section had been curtained off correctly. After they completed the work described, Brown drove to a nearby section of the mine that was unoccupied, unlit, and had a low ceiling. As in the previous incidents, Brown walked around to

3

plaintiff's side of the vehicle and attempted to kiss her, touch her, and unzip her pants. He also made various sexually suggestive comments. Plaintiff again told him "No" and attempted to push him away. Ultimately, Brown exposed himself and forced plaintiff to masturbate him.

On June 7, 1993, Brown ordered plaintiff to clean up around the shifter's office. After she had finished, Brown ordered her to accompany him in taking a load of materials to a section of the mine. On the way, Brown stopped the vehicle at an old unoccupied section of the mine and told plaintiff, "Look, I made us a bed out of [burlap] cloth." Brown asked plaintiff to lie down with him and she did. Brown repeatedly asked her to have sex with him and attempted to kiss and touch her, but plaintiff said "No." Brown then forced plaintiff to masturbate him.

During the period of time in which the incidents took place, plaintiff was aware of rumors indicating Brown was going to replace Larry Robertson, who was retiring in the safety office. The safety office was located on the surface and plaintiff believed if Brown went to that position she would not be in contact with him or under his supervision. However, when plaintiff returned to work on June 21, 1993, after a three-day break, she learned Brown would not be replacing Robertson. At that point, she knew the "problem wasn't going to go away," and she "was going to have to do something to put an end to it." However, she was scared that no one in management would believe her and that she would lose her job.

On June 26, 1993, plaintiff arrived at work and learned her usual "buddy" had been assigned to work with another miner and she was the "extra person." Afraid Brown would again attempt to harass her, she completed a few of her assigned tasks and told Brown she was sick and was going home.

On June 27, 1993, plaintiff was again designated the "extra person." Brown ordered her to accompany him to shovel some tunnels in the mine. When they arrived, Brown again began harassing her in the identical manner as in the previous incidents. Plaintiff refused his advances and refused to masturbate him. Brown drove plaintiff back to his office and told her to go to her machine and work through lunch. Later that same day, Brown ordered plaintiff to help him clean his office. When they were alone, he again began harassing plaintiff, touching her, and repeatedly asking her to have sex. Plaintiff refused Brown's advances.

4

On June 28, 1993, plaintiff called the line foreman and told him she was having some problems and needed to take some vacation days to finish out the remainder of her eleven-day shift. On her next scheduled work day (July 5, 1993), plaintiff called in sick. She also called in sick the following day.

On July 7, 1993, plaintiff called Dale Janway, a manager in the safety office, and told him what had happened with Brown. Janway told plaintiff "this is pretty big," and he would have to talk with Ken Leivo, the human resources manager. Later that afternoon, Leivo telephoned plaintiff and informed her she would be on administrative leave pending the outcome of his investigation. Leivo also asked plaintiff to prepare a written statement outlining what had happened. Plaintiff and Leivo talked on the telephone several times between July 7 and July 12. Leivo told plaintiff that Brown had admitted everything but said the incidents were consensual.

On July 14, 1993, Leivo issued a three-page "Determination and Disposition," noting plaintiff's and Brown's versions of what happened were substantially similar, with the exception that Brown alleged the encounters were consensual. * * * [T]he document indicated that plaintiff would be "made whole for all work time lost as a result of the matter," that she would be provided with counseling services and necessary medical treatment and prescription drugs, that she would be moved to a different crew in the mine, that Brown would be formally reprimanded for his involvement in the incident, that Brown would "be placed on permanent probation for any future activity of this type," and that Brown would be ordered to have no contact with plaintiff "other than that which might be absolutely necessary as part of his required duties."

Although plaintiff remained on the Potash payroll for approximately one year, she never returned to work. On June 17, 1994, her employment was terminated due to a reduction in force at the mine.

Id. at 1440-42 (internal citations omitted).

Harrison filed suit against EPI and Brown alleging hostile work environment sexual harassment under Title VII of the Civil Rights Act of 1964 and violations of New Mexico tort law. A jury returned a verdict in favor of

5

Harrison and against Brown on her state law claims of intentional infliction of emotional distress and battery, and awarded her compensatory damages of $102,500 and punitive damages of $40,000.  The jury found against Harrison, however, with respect to her Title VII claim against EPI.

Harrison appealed from the judgment on her Title VII claim, arguing that the district court erroneously instructed the jury as to the requirements for imposing liability on an employer for sexual harassment perpetrated by one of its supervisory employees.[1]  We agreed with Harrison and reversed and remanded for further proceedings on the Title VII claim.  Harrison I, 112 F.3d at 1451. Following issuance of its companion decisions in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), the Supreme Court granted EPI's petition for writ of certiorari, summarily vacated the decision in Harrison I, and remanded the action to this court for further consideration.  Eddy Potash, Inc. v. Harrison, 524 U.S. 947 (1998).  On remand, we again concluded that the district court improperly instructed the jury with respect to the standards for imposing liability on an employer for sexual harassment perpetrated by one of its supervisory employees.[2]  Harrison v. Eddy

---

[1] Brown did not appeal from the judgment entered against him.

[2] We also rejected EPI's argument that it was entitled to judgment as a matter of law with respect to the affirmative defense outlined in Faragher and Burlington.  Harrison II, 158 F.3d at 1377.

6

Potash, Inc., 158 F.3d 1371, 1377 (10th Cir. 1998) (Harrison II). Accordingly, we reversed the judgment in favor of EPI and against Harrison on her Title VII claim and remanded the case to the district court for further proceedings.

On remand to the district court, the parties filed cross-motions for summary judgment. EPI asserted in its motion that it was entitled to summary judgment on Harrison's Title VII claim because, in its view, the uncontroverted facts developed at the first trial demonstrated that it could satisfy the affirmative defense outlined in Faragher and Burlington. Harrison, in her motion, argued that she was entitled to partial summary judgment on the issue of whether Brown's conduct was severe or pervasive enough to constitute actionable sexual harassment under Title VII. In support of her motion, Harrison asserted that the jury in the first trial, by finding in her favor on the two tort claims against Brown, effectively found that one or more of the encounters between herself and Brown were non-consensual. Harrison asserted that EPI was bound by the jury's finding in this regard because, "[a]lthough the judgment in [her] favor [wa]s only against . . . Brown, EPI and Brown [we]re privies . . . with a complete identity of interests." App. at 112. Harrison emphasized that "EPI's liability was predicated on the conduct of Brown," and that both Brown and EPI "were represented by the same counsel" and "put on a single, unified defense" during the first trial. Id. Finally, Harrison asserted that the two defendants shared a single, common

defense during the first trial, i.e., that the encounters between Brown and Harrison were consensual. Thus, Harrison asserted, "the only liability issue left for the jury's determination [wa]s whether or not EPI [wa]s itself liable for . . . Brown's sexual harassment." Id.

The district court issued an initial order granting in part Harrison's motion for partial summary judgment and granting in part and denying in part EPI's motion for summary judgment. With respect to Harrison's motion, the district court concluded that EPI was "collaterally estopped from denying Harrison's lack of consent to Brown's physical sexual contact." Id. at 280. More specifically, the district court concluded that "[b]ecause one of the elements of battery is that it be non-consensual, and because the jury returned a verdict in favor of Harrison on her battery claim against Brown, the issue of Harrison's consent ha[d] already been fully litigated and necessarily decided." Id. With respect to EPI's motion, the district court concluded that, consistent with the opinion in Harrison II, there was "a genuine issue of material fact concerning EPI's affirmative defenses under Faragher." Id. at 279. Because, however, Harrison conceded she was not entitled to punitive damages, the district court granted summary judgment in favor of EPI on the issue of punitive damages.

At the direction of the district court, the parties submitted proposed jury instructions on the issue of unwelcome sexual advances. After reviewing the

8

parties' proposed jury instructions, the district court issued an order granting in its entirety Harrison's motion for partial summary judgment. In doing so, the court noted that EPI had conceded at the May 1999 pretrial conference "that the only physical contact between Brown and Harrison was of a sexual nature, so there [wa]s no genuine issue of material fact regarding the requirement that the conduct be sexually orientated." Id. at 285J. Thus, the court concluded, "the issues to be decided [we]re whether there [wa]s a genuine issue of material fact regarding the 'unwelcome' element of Harrison's hostile work environment claim, and whether Brown's conduct was sufficiently severe or pervasive as to alter the conditions of Harrison's employment and create an abusive working environment under both an objective and subjective standard." Id. After examining "the jury instructions, jury verdict, [and] trial transcript" from the first trial, the district court concluded "there [wa]s no genuine issue of material fact regarding Harrison's claim that Brown's conduct created a hostile work environment," and that the only issue to be decided at trial was "whether the affirmative defense set forth in Faragher and Burlington insulate[d] EPI from liability for Brown's conduct." Id.

At trial, the jury rejected EPI's affirmative defense and found in favor of Harrison on her Title VII claim. Because the parties had agreed, prior to trial, to be bound by the damage figures assessed in the first trial, the jury in the second

trial did not consider or assess damages. EPI subsequently filed a motion for judgment notwithstanding the verdict or, in the alternative, for new trial. EPI argued, in part, that the district court erred in granting partial summary judgment in favor of Harrison "on the elements of sexual harassment." Id. at 339. The district court denied EPI's post-trial motion.

## II.

*Entry of partial summary judgment*

EPI contends the district court erred in granting partial summary judgment in favor of Harrison on the issue of whether she was subjected by Brown to actionable sexual harassment. EPI forwards two arguments in support of its position. First, EPI contends that our mandate in Harrison II required the district court to conduct a trial de novo on all factual issues relevant to Harrison's Title VII claim, and thus effectively precluded the district court from granting summary judgment on any aspect of the Title VII claim. Second, and alternatively, EPI argues that it was improper for the district court, in granting partial summary judgment in favor of Harrison, to "rely upon any factual determination made by the jury in the first trial on any issue of liability." Aplt. Br. at 20.

We review de novo the district court's grant of summary judgment, applying the same legal standard as the district court. E.g., Trujillo v. Univ. of Colo. Health Sciences Ctr., 157 F.3d 1211, 1213 (10th Cir. 1998). Summary

judgment is appropriate only if the admissible evidence shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We also review de novo the district court's application of the doctrine of collateral estoppel. See Dodge v. Cotter Corp., 203 F.3d 1190, 1197 (10th Cir.), cert. denied, 121 S. Ct. 71 (2000); see also Gonzales v. Hernandez, 175 F.3d 1202, 1204 (10th Cir.1999) (reviewing de novo a district court's entry of summary judgment barring claims under the doctrine of collateral estoppel).

Addressing EPI's arguments in order, we note that EPI failed to argue in the district court that our mandate in Harrison II precluded the district court from considering dispositive motions relevant to Harrison's Title VII claim. Indeed, EPI filed its own dispositive motion on remand. Thus, EPI has waived the argument for purposes of appeal. See Vitkus v. Beatrice Co., 127 F.3d 936, 946-47 (10th Cir. 1997) (deeming issue raised first time on appeal waived). Even if we were willing to overlook EPI's waiver, we are not persuaded there is any merit to its argument. Nothing in the mandate of Harrison II precluded the district court from considering dispositive motions on any or all issues relevant to Harrison's Title VII claim. See Guidry v. Sheet Metal Workers Int'l Assoc., 10 F.3d 700, 706 (10th Cir. 1993) ("When further proceedings follow a general remand, the lower court is free to decide anything not foreclosed by the mandate

11

issued by the higher court.") (internal quotations omitted).

EPI's second argument, i.e., that it was improper for the district court to grant summary judgment based upon any determination made by the jury in the first trial, is more difficult. In its initial order discussing Harrison's motion for partial summary judgment, the district court concluded that, based on the jury's verdict against Brown in the first trial, EPI was "collaterally estopped from denying Harrison's lack of consent to Brown's physical sexual contact." App. at 280. In its second order discussing Harrison's motion, the district court analyzed whether, as a matter of law, Brown's actions created an actionable hostile environment for purposes of Title VII. The district court noted that EPI had conceded during a May 1999 pretrial conference that the only physical contact between Brown and Harrison was of a sexual nature. Based upon this concession, the court concluded there was no genuine issue of material fact concerning whether Brown's conduct was sexually oriented. The court then reviewed the essential elements of the two tort claims against Brown and concluded, based upon the jury's findings on those tort claims, that Harrison had established as a matter of law that Brown's conduct was both "unwelcome" and objectively hostile. The court noted it was uncontroverted that Harrison subjectively believed that Harrison's conduct was hostile. Thus, the court concluded "there [wa]s no genuine issue of material fact regarding Harrison's claim that Brown's conduct

12

created a hostile work environment," and the only issue of fact to be decided at trial was whether EPI was entitled to prevail on the <u>Faragher/Burlington</u> affirmative defense. <u>Id.</u> at 285J.

Although there are some conflicting statements in the district court's second order, it is clear that the district court relied, to some degree, on the doctrine of collateral estoppel. As the Supreme Court has noted:

> "Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

<u>Ashe v. Swenson</u>, 397 U.S. 436, 443 (1970). To apply collateral estoppel, the following elements must be established: (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. <u>Dodge</u>, 203 F.3d at 1198.

EPI has challenged only the first element -- whether the issue previously decided is identical with the one now presented.[3] In deciding this question, the

---

[3] At no time, either in the district court or in this appeal, has EPI argued that it was not in privity with Brown for purposes of collateral estoppel.

13

jury instructions from the first trial are the "blueprint for determining the parameters of the first jury's verdict." Id. The jury at the first trial was instructed that, to recover on her claim of outrage, Harrison had to prove: (1) "[t]hat the conduct of . . . Brown was extreme and outrageous under the circumstances," (2) "[t]hat . . . Brown acted intentionally or recklessly," and (3) "[a]s a result of the conduct of . . . Brown, [she] experienced severe emotional distress." App. at 285K. With respect to the battery claim, the jury at the first trial was instructed that Harrison had to prove: (1) "[t]hat . . . Brown intentionally touched or struck [her]," (2) "[t]hat such contact by [Brown] was harmful or offensive," and (3) "[t]hat the contact was without consent of the plaintiff." Id. As the district court correctly concluded, the jury's verdict in favor of Harrison on these two claims means the jury necessarily found "that Brown intentionally touched or struck Harrison without her consent, that the contact was harmful or offensive to Harrison, that Brown's conduct was extreme and outrageous, that Brown acted intentionally and recklessly, and that Brown's conduct caused Harrison severe emotional distress." Id. at 285L.

The next question is whether any of the issues decided by the first jury are identical to those presented in Harrison's Title VII case against EPI. To prevail on her Title VII claim, Harrison had to establish, in part, that Brown's conduct toward her was (1) unwelcome, (2) based upon her sex, and (3) sufficiently severe

14

or pervasive as to alter the conditions of her employment and create an abusive working environment. See Faragher, 524 U.S. at 787-89; Harris v. Forklift Sys., Inc., 510 U.S. 17, 20-23 (1993); Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65-73 (1986). Obviously, although there is some common ground between these issues and those decided by the jury in the first trial, they are not identical. Nevertheless, as the district court noted, EPI's only defense to the Title VII claim, apart from its assertion of the Faragher/Burlington affirmative defense, was that Harrison consented to Brown's sexual advances. Because the jury in the first trial decided this issue of fact against Brown and EPI, we conclude the district court was correct in determining that the doctrine of collateral estoppel prohibited EPI from relitigating that issue. In other words, the doctrine of collateral estoppel did not bar EPI from relitigating any of the essential elements of Harrison's Title VII claim, but it did prohibit EPI from relitigating the more narrow factual issue of whether Harrison consented to Brown's sexual advances.[4]

Having concluded that Harrison's lack of consent was established and

---

[4] The district court concluded that the verdict on the tort claims in the first trial established that, "on at least one occasion," Harrison did not consent to Brown's conduct. App. at 285M. Our view is somewhat different. In light of the testimony of Harrison and Brown, we believe the jury could only have reasonably reached one of two conclusions: either that Harrison consented to all of the advances, or that she consented to none of them. By finding against Brown on the tort claims, we believe the jury necessarily found that all of the incidents described by Harrison were nonconsensual.

15

controlling for purposes of her Title VII claim, the remaining question is whether there was a basis for granting partial summary judgment in Harrison's favor on any of the essential elements of that claim. The details of the encounters between Brown and Harrison, except for the consent issue, were unchallenged by EPI. Combined with the collateral estoppel effect of the first jury's resolution of the consent issue, it was therefore uncontroverted that, on several occasions over a seven-week period, Brown made aggressive sexual advances to Harrison and, against her will, intimately touched her body and forced her to masturbate him. In short, it was uncontroverted that Brown sexually assaulted Harrison on multiple occasions over a relatively brief period.

Based upon this uncontroverted evidence, we agree with the district court that Harrison was entitled to summary judgment on three elements of her Title VII claim. First, it was undoubtedly established that Brown's conduct was unwelcome, i.e., unwanted and distasteful. Second, there is no doubt that Brown's conduct was based on Harrison's sex. E.g., Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) (discussing "based on sex" element and noting it includes sexual advances). Third, there were no genuine issues of material fact concerning whether Brown's conduct was sufficiently severe or pervasive as to alter the conditions of Harrison's employment and create an abusive working environment. In Harris, the Supreme Court concluded that, for

16

purposes of this third element, the conduct in question must be judged by both an objective and a subjective standard – the conduct must be "severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive," and the victim must "subjectively perceive th[at] environment to be abusive." 510 U.S. at 21. Harris further concluded that, in determining whether a work environment is hostile or abusive, all of the circumstances of the case must be examined, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the plaintiff's work performance; and (5) what psychological harm, if any, resulted. See id. at 23.

Here, it was uncontroverted that Harrison subjectively perceived Brown's assaults as severe enough to create a hostile and abusive working environment. From an objective standpoint, it appears clear that a jury could only have agreed. Although the assaults occurred over a relatively short period, they were extreme in nature, they were physically threatening and humiliating to Harrison (and would have been to any reasonable person in her position), they clearly interfered with her work performance (causing her to call in sick on several occasions to avoid contact with Brown), and it was uncontroverted that they caused

17

psychological harm to Harrison.[5]

*EPI's requested jury instructions*

EPI contends the district court erred in refusing two of its tendered jury instructions. We review a district court's refusal to give a requested jury instruction under an abuse of discretion standard. Dodoo v. Seagate Tech., Inc., 235 F.3d 522, 529 (10th Cir. 2000). In doing so, we consider de novo whether the instructions, as a whole, accurately informed the jury of the issues and the governing law. See Fed. Deposit Ins. Corp. v. Schuchmann, 235 F.3d 1217, 1221 (10th Cir. 2000).

*Indest instruction.* EPI tendered, but the district court refused to give, the following instruction: "You are instructed that if you find that Plaintiff Jeanne Harrison promptly complained of Robert L. Brown's harassing conduct and that Eddy Potash promptly responded, disciplined appropriately, and stopped the harassment, then you should find for Eddy Potash." App. at 106. EPI contends

---

[5] Although it is arguable that even one of the incidents, viewed alone, would have been sufficient to create a hostile or abusive working environment for purposes of Title VII, see Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (indicating that a Title VII plaintiff can establish actionable sexual harassment based upon "a single incident [of sexual harassment that] was extraordinarily severe"); Torres v. Pisano, 116 F.3d 625, 631 n.4 (2d Cir. 1997) ("Of course, even a single episode of harassment, if severe enough, can establish a hostile work environment."), we need not decide this issue.

18

that the tendered instruction, which was based upon <u>Indest v. Freeman Decorating, Inc.</u>, 164 F.3d 258 (5th Cir. 1999), correctly stated the law and should have been given to the jury.

The sole issue at trial in this case was whether EPI could avoid vicarious liability for Brown's misconduct by establishing its entitlement to the affirmative defense outlined in <u>Faragher</u> and <u>Burlington</u>. The <u>Faragher/Burlington</u> affirmative defense can only be raised if "no tangible employment action [wa]s taken" by the harassing supervisor against the plaintiff employee. <u>Faragher</u>, 524 U.S. at 807. If this preliminary requirement is met, the employer must establish, by a preponderance of the evidence, that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Id.</u> EPI argued in the district court, and continues to assert on appeal, that <u>Indest</u> correctly modified the <u>Faragher/Burlington</u> affirmative defense and that the district court should have recognized and adopted this modification.

In <u>Indest</u>, the plaintiff employee filed suit against her employer under Title VII alleging she had been sexually harassed by a member of the employer's upper management. More specifically, the plaintiff alleged that at a week-long convention where she was working, the alleged harasser on five occasions made

19

crude sexual comments and sexual gestures to her. Following the fifth incident, plaintiff reported the harasser's conduct to her supervisor. In turn, the employer swiftly investigated the incidents and reprimanded the harasser. Although the harassment ceased, plaintiff filed suit against the employer alleging actionable sexual harassment under Title VII. The district court granted judgment as a matter of law in favor of the employer.

On appeal, a divided panel of the Fifth Circuit affirmed. The authoring judge purported to distinguish the case from Faragher and Burlington on the grounds that, "for purposes of imposing vicarious liability, a case presenting only an incipient hostile environment corrected by prompt remedial action should be distinct from a case in which a company was never called upon to react to a supervisor's protracted or extremely severe acts that created a hostile environment." Indest, 164 F.3d at 265. The authoring judge offered four reasons for doing so: (1) "when a plaintiff promptly complains about a supervisor's inappropriate sexual actions, she can thwart the creation of a hostile work environment"; (2) a "company's swift response to the plaintiff's complaint should have consequences for its vicarious liability exposure precisely because the company forestalled the creation of a hostile environment"; (3) "[i]mposing vicarious liability on an employer for a supervisor's 'hostile environment' actions despite its swift and appropriate remedial response to the victim's complaint

would . . . undermine not only Meritor but Title VII's deterrent policy"; and (4) "Faragher implies that a plaintiff should not wait as long as it usually takes for a sexually hostile working environment to develop when the company has an effective grievance mechanism." Id. at 265-67.  The authoring judge then proceeded to craft her own standard under which, if a plaintiff employee promptly complains of harassing conduct and the employer promptly responds, disciplines the harasser and stops the harassment, the employer is relieved of Title VII vicarious liability for the harasser's conduct.  Id. at 267.

There are several major problems with Indest.  First, it represents the views of only one member of the three-judge panel that decided the case.  The other two members of the panel concurred in the judgment only, and one of the concurring judges wrote a separate, subsequently published concurring opinion expressly rejecting the analytical framework enunciated in Indest.[6]  Indest v. Freeman Decorating, Inc., 168 F.3d 795, 796 (5th Cir. 1999) (Indest II) ("I cannot agree with Judge Jones's conclusion that the Supreme Court's remarkably straightforward and perfectly consistent twin opinions in [Faragher and Burlington] do not control the present case–and, indeed all cases in which the plaintiff seeks to hold his employer vicariously liable for a supervisor's sexual

---

[6]  Indest II  proposed affirming the district court's judgment on the grounds that the conduct was not severe or pervasive enough to constitute actionable sexual harassment under Title VII.  168 F.3d at 796.

21

harassment.").  Because, as pointed out in Indest II, the third member of the panel did not join either opinion, "neither enjoys a quorum and thus neither writing constitutes precedent in [the Fifth] Circuit."  Id. at 796 n.1.

Second, we have effectively rejected the modified employer defense enunciated in Indest.  In Gunnell v. Utah Valley State College, 152 F.3d 1253 (10th Cir. 1998), the plaintiff filed suit against her employer under Title VII alleging, in part, that she had been subjected to sexual harassment by her supervisor.  The district court (prior to the issuance of Faragher and Burlington) granted summary judgment in favor of the employer on the grounds that "the sexual harassment stopped after [plaintiff] complained" about it to the employer's personnel director.  Id. at 1259.  We reversed and remanded with directions to the district court to apply the two-pronged defense set forth in Faragher and Burlington.  In doing so, we effectively rejected the position advanced in Indest, i.e., that an employer's prompt corrective action can be sufficient by itself to avoid vicarious liability under Title VII for sexual harassment committed by a supervisory employee.

Third, even assuming that Gunnell did not resolve the issue, the reasoning of Indest is highly suspect and, in our view, should not be adopted.  As outlined in Indest II, there is no reason to believe that the "remarkably straightforward" framework outlined in Faragher and Burlington does not control all cases in

22

which a plaintiff employee seeks to hold his or her employer vicariously liable for a supervisor's sexual harassment. Indest II, 168 F.3d at 796.

Finally, even ignoring all of the problems already cited, the facts of Harrison's case are so far removed from the facts of Indest that the modified employer defense announced therein would not be applicable here. Indest involved a handful of crude sexual comments and gestures made during the course of a week-long seminar; in the words of the Indest court, it "was neither severe nor pervasive," Indest, 164 F.3d at 264, and, at most, created what that court characterized as "an incipient hostile environment." Id. at 265. Here, in contrast, Brown's misconduct was most certainly "severe," and undoubtedly created a hostile work environment for Harrison.

We therefore conclude the district court did not abuse its discretion in rejecting EPI's tendered instruction. In short, the tendered instruction was not an accurate statement of the governing law, and would have misled the jury in its determination of the issues.

*Generalized fear of retaliation instruction.* EPI asked the district court to give the following instruction: "Generalized fear of retaliation or repercussions related to reporting to an employer of sexual harassment in the workplace does not constitute reasonable grounds for an employee's failure to raise a complaint of harassment with her employer." App. at 107. The district court rejected the

tendered instruction on the grounds that it "unduly emphasize[d] one narrow area of the law that [wa]s adequately covered" in the court's other instructions. Id. at 577.

The instruction tendered by EPI appears to be a correct statement of federal law. Although we have never addressed the issue, other circuit courts have expressly stated that, for purposes of applying the Faragher/Burlington affirmative defense, "[a] generalized fear of retaliation does not excuse a failure to report sexual harassment." Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 266 (4th Cir. 2001); see Shaw v. Autozone, Inc., 180 F.3d 806, 813 (7th Cir. 1999) ("[W]e conclude that an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under Ellerth to alert the employer to the allegedly hostile environment."), cert. denied, 528 U.S. 1076 (2000); Madray v. Publix Super Mkts., Inc., 30 F. Supp. 2d 1371, 1375 (S.D. Fla. 1998) ("An employee's generalized fear of repercussions cannot form the basis for an employee's failure to complain to his or her employer."), aff'd 208 F.3d 1290 (11th Cir. 2000).

The question, then, is whether the subject matter of the requested instruction was adequately covered in the district court's general instructions. See Schuchmann, 235 F.3d at 1222. Consistent with Faragher and Burlington, the district court instructed the jury that EPI would be liable for Brown's sexual

24

harassment of Harrison unless EPI could prove, by a preponderance of the evidence, that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "Harrison unreasonably failed to take advantage of any preventive or corrective opportunities provided by [EPI] or to avoid harm otherwise." App. at 314. Although the district court did not provide any further explanation of either prong of the affirmative defense, we conclude that this general instruction, considered together with the court's other instructions, properly conveyed to the jury the issues to be decided and the governing law. The instruction precisely tracked the Supreme Court's description of the employer's affirmative defense in Faragher and Burlington. See Burlington, 524 U.S. at 765; Faragher, 524 U.S. at 807. Thus, we are unable to conclude the district court abused its discretion in rejecting the tendered instruction. See generally United States v. Cerrato-Reyes, 176 F.3d 1253, 1262 (10th Cir. 1999) (citing various cases in which it may have been preferable to give a tendered instruction, but where the district court did not err in refusing to do so because the jury was not otherwise misled by the district court's general instructions).

*EPI's motion for judgment as a matter of law*

EPI contends the district court erred in denying its motion for judgment as a matter of law. According to EPI, the evidence presented at trial unequivocally

25

demonstrated that it was entitled to prevail on the affirmative defense outlined by the Supreme Court in <u>Faragher</u> and <u>Burlington</u>. We review de novo a district court's disposition of a motion for judgment as a matter of law, applying the same standard as the district court. <u>Ballard v. Muskogee Reg'l Med. Ctr.</u>, 238 F.3d 1250, 1252 (10th Cir. 2001). Such a judgment is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion. <u>Id.</u>

Focusing on the first prong of the <u>Faragher/Burlington</u> affirmative defense, we conclude the jury could reasonably have found that EPI failed to exercise reasonable care to prevent any sexually harassing behavior. On October 4, 1989, EPI drafted and disseminated to its supervisory personnel a written "policy statement on sexual discrimination and sexual harassment." App. at 702. At that time, EPI (through its Human Resource Manager, Kenny Leivo) instructed its supervisory personnel to "hold . . . meeting[s] with [their respective] crew[s] and read the policy statement to them," and "[p]ost the Policy on the bulletin board[s] after your meeting[s]." <u>Id.</u> Although there is no indication in the record that EPI's supervisory personnel failed to comply with these directions, the evidence indicates that non-supervisory personnel were not provided with copies of the policy, nor were copies of the policy posted on all of the bulletin boards in the mine. In particular, it was uncontroverted that a copy of the policy was not

26

posted in the changing room used by the women miners.  More importantly, the

evidence strongly suggests that, subsequent to October 4, 1989, the policy was

largely ignored.  Brown, the harasser in this case, testified without contradiction

that no mention was made of the policy by EPI management after October 1989,

and that no seminars on the subject of sexual harassment were ever held by EPI.

Further, it was uncontroverted that, when Harrison began working for EPI in May

1992,[7] she was neither informed of the policy nor was a written copy of the policy

included in the folder of written materials provided to her by EPI during

orientation.  Taken together, this evidence clearly would have allowed the jury to

conclude that EPI exercised less than reasonable care in preventing sexual

harassment by its employees.  See Brown v. Perry, 184 F.3d 388, 396 (4th Cir.

1999) (noting "that mere promulgation of . . . a [sexual harassment] policy may

well fail to satisfy the employer's burden" under the first prong of Faragher); cf.

Shaw, 180 F.3d at 811-12 (concluding that employer exercised reasonable care to

prevent sexual harassment where employer adopted an anti-harassment policy

which it distributed to each of its employees, each employee was required as a

condition of employment to read and comply with the policy, employer regularly

trained managers regarding the policy, and supervisors were not isolated from

_____

[7] Harrison had previously worked for EPI on two separate occasions, once in 1987 and once in 1988.  At neither of those times did EPI have an official policy in place regarding sexual harassment.

higher management).

The judgment of the district court is AFFIRMED.