**Jamie MCCURDY Plaintiff**

v.

**ARKANSAS STATE POLICE**
**Defendant**

**No. 4:02–CV–542–GTE.**

United States District Court,
E.D. Arkansas,
Western Division.
Little Rock Division.

Aug. 4, 2003.

Robert A. Newcomb, Attorney at Law, Little Rock, for Jamie McCurdy, plaintiff.

Lori Freno, Melanie Winslow Hoover, Arkansas Attorney General's Office, Little Rock, for Arkansas State Police, Arkansas, State of, defendants.

### MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

Presently before the Court is the Defendant's Motion for Summary Judgment. The Plaintiff has responded and the Defendant has filed a reply brief. The Court is now prepared to rule. The Defendant's motion will be granted.

## I. Introduction

The Plaintiff is employed by the Arkansas State Police as a non-commissioned police radio dispatcher. On August 29, 2002, she filed suit against the Arkansas State Police and the State of Arkansas contending that she was discriminated against on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e *et seq.* Specifically, she contends that Arkansas State Police Sergeant Darryl Hall sexually harassed her, and that the Defendants are liable for his conduct. The Plaintiff did not sue Sergeant Hall.

On September 25, 2002, the Court entered an Order dismissing separate Defendant the State of Arkansas from the case. Presently before the Court is the Arkansas State Police's Motion for Summary Judgment. A jury trial is scheduled for August 25, 2003.

## II. Factual Background

In her Complaint, the Plaintiff avers as follows:

On July 5, 2002, a supervisor of the Arkansas State Police, Sergeant Darryl Hall, while on the premises of the Arkansas State Police, wearing the uniform of a Sergeant of the Arkansas State Police, and during working hours, subjected Plaintiff to unwelcome and unsolicited actions, including but not necessarily the following:

a. The supervisor reached under Plaintiff's arm and grabbed her breast.

b. The Plaintiff jerked away from the supervisor, at which time the supervisor grabbed her arm and said "she had a hole in her shirt" and when Plaintiff looked down he stated, "stop looking at your tits."

c. The supervisor then sat down next to the Plaintiff and asked her where her uniform was and when Plaintiff responded that it was Friday (Friday being casual dress days), the supervisor stated that if he was the chief, [her] uniform would be panties and a tank top.

d. The supervisor then left the radio room and returned later, and started playing with Plaintiff's hair. The Plaintiff then attempted to leave the radio room and the supervisor told her to turn around and again put his fingers in her hair.

e. The Plaintiff was able to leave the radio room, but upon her return, supervisor, Sergeant Hall, was still present, and in conversation stated that Plaintiff had a real nice voice on the radio and that she turned him on.

f. The supervisor then, without consent of the Plaintiff, and against her

wishes, hugged her, pressing his body against hers, in an unwelcomed manner that any reasonable person would know a reasonable woman would object to.

The summary judgment record provides further details of the encounter between the Plaintiff and Sergeant Hall. On Friday, July 5, the Plaintiff was working the 3:00 p.m. to 11:00 p.m. shift in the Little Rock Communications Center with Operators Jeanie Hill and Tracy Wilson. At 5:30, while Ms. Hill was out of the room, Sergeant Hall entered the room. Sergeant Hall had entered the room to await a trooper who was transporting an inmate from a hospital to a holding cell. The Plaintiff had met Sergeant Hall only once before. The Plaintiff alleges that upon entering the room, Sergeant Hall behaved in the manner described above.

After rebuffing Sergeant Hall's actions, the Plaintiff eventually left the Communications Center to go outside and smoke. After fifteen minutes, she returned to the room knowing that Sergeant Hall was still present. Ms. Hill had returned to the room, and Trooper James Reid was also present. Sergeant Hall then allegedly touched the Plaintiff's hair, commented on her voice, and hugged her, as described above. The Plaintiff's encounter with Sergeant Hall lasted approximately one hour.

That night, the Plaintiff called Sergeant Shawn Garner to report Sergeant Hall's behavior. Sergeant Garner was not the Plaintiff's immediate supervisor, but was the highest ranking individual in the chain of command on duty that Friday night. The Plaintiff and Sergeant Garner met at 9:00 p.m. Later that night, Sergeant Garner called Sergeant Hall's direct supervisor, Lieutenant Gloria Weakland, at home, to report the Plaintiff's allegations. Lieutenant Weakland instructed Sergeant Garner to ensure that the Plaintiff and Sergeant Hall had no contact for the re-

mainder of the weekend. Sergeant Garner responded that this would not be a problem, because the Plaintiff was near the end of her nightly shift, and was not scheduled to work again until the following Tuesday.

Upon arriving for work on Monday, July 8, Lieutenant Weakland informed her immediate supervisor, Captain Carl Kirkland, of the Plaintiff's allegations against Sergeant Hall. Later that day, Lieutenant Weakland and Captain Kirkland began interviewing those who witnessed the encounter.

At the conclusion of the interviews, Lieutenant Weakland and Captain Kirkland wanted to ensure that the Plaintiff and Sergeant Hall had no further contact with one another until an investigation had been completed. They instructed Telecommunications Supervisor Karen Boyer to assign the Plaintiff to south side radio duties when the Plaintiff and Sergeant Hall's north side shifts overlapped. Upon returning to work on Tuesday, July 9, the Plaintiff began her south side radio duties. Sergeant Hall was instructed not to have any contact with the Plaintiff.

Before discussing the Arkansas State Police's further investigation into the Plaintiff's allegations, the Court notes the Arkansas State Police Complaint Procedure, as described by the Defendant:

The ASP's Field Operations Policy and Procedure Manual includes a section on how a complaint of officer misconduct is reported and investigated. Upon receipt of a valid complaint of misconduct by an ASP officer, the commander shall have the complainant document the complaint by completing a Police/Citizen Complaint Form. Once the complainant completes the form, the Special Investigations Unit is responsible for investigating the alleged misconduct. The Policy and Procedure manual provides that

the investigation should be completed within thirty days upon receipt of the complaint. Upon completion of the investigation, the investigating officer turns the investigation file over to the Division Commander, and if the investigating officer recommended disciplinary action, the Division Commander is responsible for convening a Disciplinary Review Board for further consideration of the matter. The DRB is to be made up of at least three members. Based on a majority decision, the DRB recommends the disciplinary action it deems appropriate based on the investigation. Once the DRB completes its consideration of the matter, it refers the matter to the Assistant Directors for their review and recommendation to the Director. The Director renders a final decision by either adopting the majority recommendation of the DRB or disregarding the DRB's recommendation. The officer accused of misconduct may appeal the Director's decision to the Arkansas State Police Commission if the Director makes a determination of termination or several other disciplinary actions enumerated in the Policy and Procedure Manual. After a full hearing on the matter, the Arkansas State Police Commission may either approve the disciplinary action taken by the Director or enhance or diminish the action taken by the Director.

Captain Kirkland and Lieutenant Weakland reported the Plaintiff's allegations to the Special Investigations Unit ("Internal Affairs"). On July 10, upon the Arkansas State Police's request, the Plaintiff submitted to Captain Kirkland a memorandum detailing in writing her allegations, and the next day she again submitted her allegations on a Police/Citizen Complaint Form.

On July 10, Lieutenant Nathaniel Jackson, the officer in charge of Internal Affairs, was assigned to investigate the Plaintiff's allegations. After he conducted interviews of the relevant witnesses and analyzed the results of a polygraph examination given to Sergeant Hall, Lieutenant Jackson determined that Sergeant Hall had violated the Arkansas State Police's Workplace Harassment Policy Numbers 28.020 and 28.030. These provisions state as follows:

### 28.020  Policy

It is the policy of the ASP that all employees have the right to work in an environment free of all forms of harassment and that all persons shall be treated fairly and equally, with dignity and respect. This agency does not condone and will not tolerate harassment in any form. Therefore, supervisors/employees shall take direct and immediate action to prevent such behavior, and to remedy all reported instances of harassment, sexual or otherwise.

### 28.030  Prohibited Activity

No employee shall either explicitly or implicitly ridicule, mock, deride or belittle any person.

Employees shall not make offensive or derogatory comments based on race, color, sex, religion or national origin either directly or indirectly to another person. Such harassment is a prohibited form of discrimination under state and federal law and is considered misconduct subject to disciplinary action up to and including termination of employment.

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

— Submission to such conduct is made either explicitly or implicitly a term or condition of employment; or

— Submission or rejection of such conduct by an employee is used as the

basis for employment decisions affecting the employee; or

— Such conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile, or offensive working environment.

Behaviors which constitute sexual harassment include but are not limited to:

— Obscene gestures;

— Flirtatious whistling;

— Abusive comments, stereotyping, or jokes about individuals of the opposite sex;

— Explicit, derogatory sexual remarks;

— Placing obscene photographs, cartoons, graphics, or sexually suggestive objects in any area occupied or observed by individuals of the opposite sex;

— Physical contact such as patting, grabbing, pinching, or constant brushing against another's body;

— Subtle requests for sexual activity;

— Any repeated or unwanted verbal or physical sexual advances which are offensive or objectionable to the recipient or which cause the recipient discomfort or humiliation or which interfere with the recipient's job performance; and

— The threat or insinuation that the lack of sexual cooperation will adversely affect the victim's employment, wages, promotion or other assigned duties.

Lieutenant Jackson completed his Investigative Summary on either July 17 or 18, and turned the file over to Captain Kirkland sometime prior to August 5. Upon a review of Lieutenant Jackson's investigation, Captain Kirkland determined that the Plaintiff's allegations were founded and that Sergeant Hall had violated the Arkansas State Police's harassment policy provisions noted above. Captain Kirkland further concluded that Sergeant Hall had also violated the Arkansas State Police Rules of Conduct pertaining to the use of course language and gestures, insubordination and improper conduct. Captain Kirkland recommended to Major J.R. Howard that Sergeant Hall be demoted to the rank of corporal, that he seek counseling for his behavior, and that he be placed on probation for one year with his actions closely monitored.

Around this time, on August 4, Captain Kirkland and Lieutenant Weakland transferred Sergeant Hall from his patrol duties to a desk sergeant position. As noted, after the Plaintiff's allegations, she began working as a dispatcher for the south side while Sergeant Hall was on duty patrolling the north side. Though they had received no information that any radio contact between the two had taken place since the July 5 incident, Captain Kirkland and Lieutenant Weakland thought that it might be possible for the Plaintiff to cover a call from the north side patrol. Thus, they relieved Sergeant Hall of his patrol duties in an effort to further insulate the Plaintiff from him. Sergeant Hall was again instructed that he was to have no contact with the Plaintiff.

Upon receiving Captain Kirkland's recommendation, Major Howard appointed a Disciplinary Review Board to review the recommendation. The Board, consisting of Captain Larry Robinson, Captain G.B. Harp and Captain Timothy K'Nuckles, first convened on August 29. The Board also interviewed the relevant witnesses. During the course of the Plaintiff's interview, she revealed for the first time that Sergeant Hall had twice, since July 5, called into the Communications Center and spoken to her about job-related matters. However, the Plaintiff acknowledged that

Sergeant Hall did not say anything inappropriate or offensive during either of the two conversations. Nevertheless, in a further effort to insulate the Plaintiff from Sergeant Hall, he was transferred from his Little Rock-area duties to the Governor Security Detail. As part of the Governor's security team, he would have no reason to contact the Communications Center.

The Board concluded that variations existed in the Plaintiff's factual allegations, and requested that Sergeant Hall re-take, and the Plaintiff for the first time take, a polygraph examination. Captain Harp of the Board explained in his deposition why the Plaintiff was required to take the polygraph: "[T]here was some discrepancies in between the statement that she gave Lt. Jackson and what she was telling us."

After receiving the results of the polygraph examinations, the Board reconvened on September 5. The Board thereafter determined that Sergeant Hall had not violated Workplace Harassment Policy Numbers 28.020 and 28.030, stating that the Plaintiff's allegations were "unfounded." Nevertheless, the Board concluded that Sergeant Hall had violated the Department's policies regarding improper conduct, course language and gestures and insubordination. The Board recommended that Sergeant Hall be transferred to another division in order to avoid future contact with the Plaintiff. Specifically, the Board's report stated:

*Determination of the Disciplinary Review Board*

The Board finds the initial allegations of Workplace Harassment # 2.020[sic] and Sexual Harassment # 28.030 alleged by the complainant Jamie McCurdy against Sergeant Hall are **unfounded.** There was not enough factual evidence presented to the Board to support Ms. McCurdy's claims.

The Board finds that Sergeant Hall violated the Department's policies on **Course Language and Gestures # 4.020** and **Improper Conduct # 4.080** because of the following:

— Sergeant Hall admitted to and witnesses corroborated the *touching of Jamie's* [sic] *McCurdy's hair on two different occasions.*

— Sergeant Hall admitted to and witnesses corroborated the saying to Jamie, *that she had a sexy voice that turned him on.*

— Sergeant Hall admitted to saying, that *"if I was king that I would have everyone wear hot pants and halter tops".*

— Sergeant Hall admitted to saying the word *tits* where Jamie McCurdy could have heard him.

— Sergeant Hall admitted that he could have made the statement to Jamie, *"do you have any black in you,"* and witness Jeanne Hill corroborated that he did.

In addition, the Board finds Sergeant Hall in violation of ASP policy **Insubordination–Truthfulness # 4.060,** whereas, he admitted, on tape, to Investigator Charlie Beall that he had been untruthful during the polygraph examination. The Board notes that during this investigation, Sergeant Hall was administered two-polygraph examination [sic] by two different examiners, and the results of both examinations showed him to be deceptive.

*Recommendation of the Disciplinary Board*

The Board recommends that Sergeant Hall be required to complete a psychological evaluation to determine his fitness for duty as an Arkansas State Police officer.

Should Sergeant Hall be found competent for duty as an Arkansas State Police officer, the Disciplinary Review

Board recommends a demotion to the rank of Corporal, and a transfer from the Highway Patrol Division in Troop A. The Board's recommendation of disciplinary action for Sergeant Hall's violation of ASP policies **Course Language and Gestures # 4.020** and **Improper Conduct # 4.080** would not have been as severe, if it was not for the untruthfulness he displayed during this investigation. The truthfulness of a supervisor is critical to every aspect of his job performance.

The Board forwarded its findings and recommendations to Lieutenant Colonel Steve Dozier. On September 16, Lieutenant Colonel Dozier recommended to Colonel Don Melton that Sergeant Hall be terminated for violating the Arkansas State Police's truthfulness policy. Colonel Melton agreed, and terminated Sergeant Hall's employment effective September 26.

Sergeant Hall appealed his termination to the Arkansas State Police Commission. After a November 15 hearing, the Commission overturned Colonel Melton's decision to terminate Sergeant Hall and adopted the Board's recommendation. The Defendant notes: "The [Arkansas State Police Commission] is an agency unrelated to the [Arkansas State Police] and is created by statute. *See* Ark.Code Ann. § 12–8–102, *et seq.*"

Upon Sergeant Hall's reinstatement, he was immediately transferred to the Forth Smith division, and demoted to the rank of corporal.

As further background information, the Court notes the following. In her complaint, the Plaintiff contends that Sergeant Hall's supervisors had prior knowledge of his inappropriate conduct towards female employees. No evidence in the summary judgment record supports this contention.

As noted, the July 5 encounter between the Plaintiff and Sergeant Hall was their second meeting. The Plaintiff contends for the first time in her brief that Sergeant Hall inappropriately touched her during their first meeting. Specifically, the Plaintiff states:

> The Plaintiff first encountered Sgt. Hall when he came into the radio room area [on an unspecified date] after Jimmy White, an Arkansas State Trooper, had been killed in an accident. At that time according to the Plaintiff, everyone was hugging each other concerning the grief felt for Trooper White's death. According to the Plaintiff, Sgt. Hall at that time touched her in an inappropriate manner by pressing against her breast. She gave Sgt. Hall the benefit of the doubt at that time because of the circumstances.

However, there is no evidence in the summary judgment record that the Plaintiff ever reported this incident to anyone within the Arkansas State Police.

In her complaint, the Plaintiff alleges that the Arkansas State Police was "aware of similar conduct by [Sergeant Hall] as a result of an article in the *Arkansas Democrat–Gazette* on or about October 13, 1995, involving testimony that occurred in the Jacksonville Municipal Court, concerning the conduct of [Sergeant Hall] by Jennifer Morris, Sandy Dyer, and Melissa Chisum." The summary judgment record reveals that the prior allegations against Sergeant Hall were made by individuals arrested by him, not fellow employees. In any event, the Arkansas State Police investigated the allegations and determined them to be unfounded (although Sergeant Hall was counseled not to place arrestees in the front seat of his patrol car). In any event, the Court concludes that Sergeant Hall's conduct toward arrestees was not a reasonable basis for the Arkansas State Police to conclude that he was likely to harass coworkers.

In her brief, the Plaintiff argues that the Arkansas State Police was on notice that Sergeant Hall had a propensity for sexually harassing co-workers because he had been previously counseled for using profanity in the presence of co-workers. The Court disagrees, failing to see how an employee's use of profanity places the employer on notice of likely sexually harassing behavior. Furthermore, there is no evidence suggesting that Sergeant Hall's profanity was of a sexual nature, or that it was in the presence of or directed toward female employees.

## III. Summary Judgment Standard

■ Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Lambert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir.1999). Rule 56(c) of the Federal Rules of Civil Procedure provides the summary judgment standard and states that it may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Court will view the evidence and the inferences that may be reasonably drawn from the evidence in a light most favorable to the nonmoving party. *See Lambert*, 187 F.3d at 934. Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See id.* To survive a summary judgment motion, a non-movant must provide sufficient, probative evidence that would permit a fact finder to rule in his favor as opposed to engaging in mere speculation, conjecture or fantasy. *See Kneibert v. Thomson Newspapers, Michigan Inc.*, 129 F.3d 444, 455 (8th Cir.1997).

## IV. Discussion

The Court is mindful that the Plaintiff did not sue her alleged harasser, but rather seeks to impose liability against the employer. A threshold issue to this analysis is whether Sergeant Hall possessed supervisory authority over the Plaintiff. If he had no such authority, the *prima facie* elements discussed by the United States Court of Appeals for the Eighth Circuit in *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir.2003), apply to the Plaintiff's claim. However, if Sergeant Hall possessed supervisory authority over the Plaintiff, the standard provided by the Supreme Court of the United States in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), is applicable.

The Defendant contends that Sergeant Hall had no supervisory authority over the Plaintiff and that they were merely co-workers. Specifically, the Defendant states:

Darryl Hall, the alleged harasser..., is an ASP employee, who worked in Troop A as a sergeant. Sergeants only have supervisory authority over lower classified employees, such as ASP troopers and corporals, thus Hall had not supervisory authority over dispatchers, including [the Plaintiff]. Hall reported directly to Lt. Gloria Weakland. Commissioned ASP employees classified as a sergeant never had any supervisory control over non-commissioned ASP employees working as a telecommunications operator.

The Defendant also stresses that it would not have been reasonable for the Plaintiff to view Sergeant Hall as a supervisor considering she had only met him once before July 5.

The Plaintiff contends that various affidavits establish that, though the dispatchers are not directly supervised by sergeants, the sergeants are viewed as supervisors because they are clearly higher in the chain of command. There is some evidence that the sergeants directed the day-to-day work activities of the dispatchers, as a sergeant is often the highest on-duty member of the chain of command. The Court notes that this was the case on the night of July 5. There is also some evidence that sergeants had disciplined dispatchers.

■ A question of fact exists as to whether Sergeant Hall possessed supervisory authority over the Plaintiff. Viewing the evidence in a light most favorable to the Plaintiff, as it must at the summary judgment stage, the Court concludes that, for purposes of the instant summary judgment motion only, there is sufficient evidence to establish that Sergeant Hall possessed actual supervisory authority over the Plaintiff. *See Todd v. Ortho Biotech, Inc.*, 175 F.3d 595, 598 (8th Cir.1999) (discussing actual supervisory authority)[1]; *see also Alverio v. Sam's Warehouse Club*, 9 F.Supp.2d 955 (N.D.Ill.1998) (discussing supervisor not in direct chain of command). Thus, in ruling on the summary judgment motion, the standard announced in *Ellerth* and *Faragher* is applicable.

The summary judgment record is clear that the Plaintiff suffered no tangible adverse employment action as part of Sergeant Hall's alleged harassment. Thus, the instant lawsuit is not a *quid pro quo* case. Rather, the question for the Court is whether Sergeant Hall's conduct subjected the Plaintiff to a sufficiently hostile work environment. *See Ellerth*, 524 U.S. at 751–67, 118 S.Ct. 2257.

■ As a starting point, the Court notes the committee comment to the Eighth Circuit's Model Jury Instruction 5.42, addressing hostile work environments:

It is impossible to compile an exhaustive list of the types of conduct that may give rise to a hostile environment sexual harassment claim under Title VII. Some examples of this kind of conduct include: verbal abuse of a sexual nature...; pinching, groping and fondling; suggestive, insulting, or obscene comments or gestures...; asking questions about sexual conduct; and unwelcome sexual advances.

The Supreme Court has also recognized that a court is to consider all the circumstances of the alleged conduct, including its frequency, it severity, whether it was physically threatening or humiliating, and whether it interfered with an employee's work performance. *See Faragher*, 524 U.S. at 787–88, 118 S.Ct. 2275. Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not constitute a hostile work environment, as Title VII is not meant to became a general civility code. *Id.* at 788, 118 S.Ct. 2275.

■ Viewing the Plaintiff's allegations in a light most favorable to her, and finding a basis in the summary judgment record for her allegations, the Court concludes, only for purposes of the instant motion, that Sergeant Hall's alleged con-

---

1. And while it certainly seems that Sergeant Hall also possessed apparent authority over the Plaintiff, an apparent authority theory is not recognized as sufficient, in the absence of actual authority, to impose employer liability in a supervisory context. *See Kirkland v. The State University of Iowa*, No. 3–99–CV–30105, 2001 WL 737548, at *6 (S.D.Iowa 2001).

However, one Circuit Court Judge has opined that an apparent-authority analysis would not necessarily be inappropriate when the harasser is not in the plaintiff's direct chain of command, as is the situation in the instant case. *See Todd*, 175 F.3d at 599–600 (Arnold, J., concurring).

duct was both objectively and subjectively offensive, and constituted a hostile work environment. The Court recognizes that the encounter lasted less than one hour, and was an isolated incident. Nevertheless, to have a supervisor, whom you had met only one time prior, approach you from behind and grab your breast, and then proceed to fondle your hair and make sexually suggestive comments, is objectively offensive and was subjectively offensive to the Plaintiff, and constitutes a sufficiently hostile work environment.

In its Answer, the Defendant asserts the affirmative defense established by the Supreme Court in *Ellerth* and *Faragher.* With the determination that the Plaintiff was subjected to a sufficiently hostile work environment, the Defendant will be entitled to summary judgment in its favor only if no reasonable jury could find that it failed to prove the affirmative defense by a preponderance of the evidence. The affirmative defense created by the Supreme Court provides as follows:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, **and** (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher,* 524 U.S. at 807, 118 S.Ct. 2275 (emphasis added). The Court further elaborated on the two elements of the defense:

> While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the

need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Id.* at 807–08, 118 S.Ct. 2275.

█ The Court concludes that no reasonable jury could conclude that the Defendant failed to satisfy by a preponderance of the evidence the first element of the defense. The Arkansas State Police certainly exercised reasonable care to prevent sexual harassment by its employees, and it took prompt steps to avoid any further harassment of the Plaintiff by Sergeant Hall.

The organization had in place a detailed sexual harassment policy, and a procedure for reporting misconduct. *See supra.* The Plaintiff, who had been employed for approximately two months when the alleged harassment occurred, received a copy of the policy at the commencement of her employment. The Plaintiff also understood that she could, and she did, promptly report Sergeant Hall's alleged conduct. Furthermore, the organization also provided sexual harassment training to employees. Sergeant Hall had attended such a seminar in 1996.

The Arkansas State Police promptly took appropriate steps to insulate the Plaintiff from further contact with Sergeant Hall. Within hours of the Plaintiff

reporting the alleged conduct, the organization ensured that the two would not come into contact the remainder of the weekend. Upon the Plaintiff's return to work the following Tuesday, her job duties were modified to ensure that she would not receive any radio communications from Sergeant Hall, and Sergeant Hall was instructed to have no contact with the Plaintiff. Approximately one month later, as the investigation progressed up the chain of command, it was determined that it was still possible for the Plaintiff to receive radio contact from Sergeant Hall. Even though the Plaintiff had not reported any contact with Sergeant Hall, the Arkansas State Police reassigned Sergeant Hall from patrol to desk duties.

Thereafter, the Plaintiff reported that she had fielded two calls from Sergeant Hall. However, she confirmed that the two calls were job-related, and that Sergeant Hall had not said anything inappropriate or offensive. Nevertheless, the Arkansas State Police relieved Sergeant Hall of his Little Rock-based duties and transferred him to the Governor Security Detail, where he would have no reason to call into the Plaintiff's communications center.

Furthermore, the Arkansas State Police promptly began its investigation on the Monday following the alleged harassment, the first business day after the incident. Interviews were commenced that day. Within one week, the investigating officers had requested and received a written statement from the Plaintiff, as well as her complaint form. Within one week, the investigation was turned over to the Internal Affairs department for further investigation. Within two weeks, Internal Affairs completed its investigation.

The investigation then proceeded further up the chain of command. The Disciplinary Review Board released its recommendation two months after the incident, and Colonel Melton fired Sergeant Hall

some three weeks later. While the investigation may seem slow-moving, this is clearly a result of state law-mandated procedure and Arkansas State Police regulations, rather than any inaction by the department. The record is clear that the Arkansas State Police responded promptly.

Even though the Arkansas State Police Commission overturned Sergeant Hall's termination, the Arkansas State Police transferred him from Little Rock to Fort Smith in an effort to insulate the Plaintiff from any further harassment.

The Plaintiff points out that the Disciplinary Review Board determined that her allegations of sexual harassment were "unfounded," and that Sergeant Hall was disciplined only for lying, improper conduct, and the use of course language and gestures. However, the fact that the Plaintiff's claims were not wholly substantiated is irrelevant.

■ Rather, the focus for the Court is whether the Arkansas State Police's response was prompt and appropriate. Clearly, the organization responded promptly and took reasonable care to ensure that the Plaintiff was insulated from Sergeant Hall. This insulation continued even after the Plaintiff's allegations were not wholly substantiated. The Court is mindful that Title VII does not obligate an employer to terminate an employee who engages in sexual harassment. *See Bailey v. Runyon*, 167 F.3d 466, 468 (8th Cir. 1999). Rather, what an employer must do is take prompt remedial action reasonably calculated to end the harassment. *Id.* at 468–69. This is precisely what the Arkansas State Police did in the instant case. No reasonable jury could conclude otherwise.

■ Thus, the Plaintiff has satisfied the first element of the *Ellerth* and *Faragher*

·affirmative defense. As noted, the second element provides:· "that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." This second element is not established by evidence in the summary judgment record. Clearly the Plaintiff took advantage of the Arkansas State Police's sexual harassment policy and promptly reported her allegations.

However, this Court questions the applicability of this second element to the facts of the instant case. Is the employer not entitled to an affirmative defense in the situation where an employee promptly reports an isolated and first incident of sexual harassment, and the employer promptly takes steps to insulate the employee from further harassment and initiates a thorough investigation?[2] Surely not, for this is what Title VII expects of employers.

The Eighth Circuit has addressed this issue in *dicta:*

> The Supreme Court's new affirmative defense was adopted to avoid "automatic" employer liability and to give credit to employers who make reasonable efforts to prevent and remedy sexual harassment. *See Faragher*, 118 S.Ct. at 2291–92. But that defense, adopted in cases that involved ongoing sexual harassment in a workplace, may not protect an employer from automatic liability in cases of single, severe, unanticipated

sexual harassment unless, for example, the ·harassment does not ripen into an actionable hostile work environment claim until the employer learns that the harassment has occurred and fails to take proper remedial action. *Cf. Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265 (5th Cir.1999). Though this is an issue of law, it is the kind of issue that is more properly addressed by the district court in the first instance.

*Todd*, 175 F.3d at 598.

The Court agrees that both *Ellerth* and *Faragher* involved situations of long term supervisor misconduct where the plaintiffs failed to report the misconduct or otherwise utilize available remedies. Thus, the Supreme Court cases establishing the affirmative defense are factually distinct from the instant case, a circumstance involving a "single, severe, unanticipated sexual harassment" that constitutes a sufficiently hostile work environment.

Upon this factual situation, the Court agrees with the analysis provided by Fifth Circuit Judge Edith Jones' opinion cited by the Eighth Circuit in *Todd*.[3] In *Indest*, Judge Jones essentially ignored the second element of the affirmative defense and held that the employer was entitled to summary judgment because it made a swift and appropriate remedial response to the employee's complaint. *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258

---

**2.** The instant case is not one where the Plaintiff had failed to previously report past incidents of sexual harassment by the harasser, nor one where the employer had received past complaints about the harasser but done nothing. Rather, the summary judgment record reveals that the July 5 incident was the first time that the Plaintiff had been harassed by Sergeant Hall (viewing the evidence in a light most favorable to the Plaintiff, the Court does not conclude that the Plaintiff unreasonably failed to take advantage of the Arkansas State Police's sexual harassment policy upon her first meeting with Sergeant Hall), and

that the Arkansas State Police had not received any previous reports about Sergeant Hall harassing female employees.

**3.** This Court recognizes that Judge Jones wrote for a three-judge panel of the Fifth Circuit, with the other two judges concurring in the judgment only. While Judge Jones' opinion may not constitute as precedent in the Fifth Circuit, *see Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1025 (10th Cir.2001), this Court nevertheless finds Judge Jones' opinion to be the correct statement of the law. *See infra.*

(5th Cir.1999). Judge Jones stated in pertinent part:

> *Ellerth* and *Faragher* do not, however, directly speak to the circumstances before us, a case in which the plaintiff quickly resorted to [the employer]'s policy and grievance procedure against sexual harassment, and the employer took prompt remedial action. The Supreme Court cases both involve complaints of longstanding supervisor misbehavior, and the plaintiffs either never utilized or claimed not to be aware of the company policies. But for purposes of imposing vicarious liability, a case presenting only an incipient hostile environment corrected by prompt remedial action should be distinct from a case in which a company was never called upon to react to a supervisor's protracted or extremely severe acts that created a hostile environment. Although the *Ellerth/Faragher* standard, which imposes vicarious liability subject to an employer's two-prong affirmative defense, does not control, it informs the principles determinative of this case.

*Indest,* 164 F.3d at 265.

The Court finds the following quotation from Judge Jones' opinion persuasive in reaching its conclusion that the Arkansas State Police is entitled to summary judgment because it had an established sexual harassment policy and grievance and investigatory procedure, the organization promptly responded to insulate the Plaintiff from further harassment, and promptly and thoroughly investigated the allegations. The Court recognizes that Judge Jones had not found a sufficiently hostile work environment in the Fifth Circuit decision; nevertheless, the Court finds the quotation relevant to its own analysis.

> First, when a plaintiff promptly complains about a supervisor's inappropriate sexual actions, she can thwart the creation of a hostile work environment. To the extent redress is sought, is justified, and is adequately provided by the company, the complained-of incidents will not likely have become severe or pervasive enough to create an actionable Title VII claim. This result effectuates the purpose of Title VII, which cannot guarantee civility in the American workplace but, at its best, inspires prophylactic measures to deter unwanted sexual harassment. By promptly invoking a company's grievance procedure, a plaintiff has received the benefit Title VII was meant to confer. In such cases, an actionable hostile environment claim will rarely if ever have matured.
>
> Second, the company's swift response to the plaintiff's complaint should have consequences for its vicarious liability exposure precisely because the company forestalled the creation of a hostile environment. In cases like *Ellerth,* by contrast, the plaintiff's failure or delay in invoking anti-harassment procedures may suggest that a company lacked vigilance or determination to enforce them or that it appeared to turn a blind eye toward sexual harassment. The *Ellerth/Faragher* test more cautiously exempts an employer from liability in the latter situation than is appropriate when a company has promptly reacted to a harassment claim and averted further distress.
>
> A third, more fundamental reason also justifies distinguishing the *Ellerth/Faragher* test from the case before us. The Supreme Court felt obliged to square its new limited vicarious liability standard "with *Meritor* 's holding that an employer is not 'automatically' liable for harassment by a supervisor who creates" a sexually hostile working environment. *Faragher,* 524 U.S. at 776, 118 S.Ct. at 2278. *Meritor* rejected imposing strict Title VII liability on employers for such claims. 477 U.S. at 72, 106 S.Ct. at

2408. *Meritor* was left in place in the Court's recent cases because of *stare decisis* and because, as the Court noted, Congress conspicuously left *Meritor* intact even as it modified other aspects of Title VII law in 1991. Most important, the Court acknowledged that *Meritor* furthers the twin deterrent and compensatory aims of Title VII. As *Faragher* put it:

> It would therefore implement clear statutory policy and complement the Government's Title VII enforcement efforts to recognize the employer's affirmative obligation to prevent violations and give credit here to employers who make reasonable efforts to discharge their duty. Indeed, a theory of vicarious liability for misuse of supervisory power would be at odds with the statutory policy if it failed to provide employers with some such incentive.

524 U.S. at 805, 118 S.Ct. at 2292.

Imposing vicarious liability on an employer for a supervisor's "hostile environment" actions despite its swift and appropriate remedial response to the victim's complaint would thus undermine not only *Meritor* but Title VII's deterrent policy. Vicarious liability would amount to strict liability even though the plaintiff had suffered neither a severe and pervasive change in her working conditions nor any adverse employment action. A holding of vicarious liability would conflict with cases, specifically approved by the Court, in which an employer's liability for co-worker sexual harassment is governed by a negligence standard, and the employer is liable only if it knew or should have known and failed to take proper remedial steps. *See Faragher*, 524 U.S. at 789, 118 S.Ct. at 2285–86. A standard imposing vicarious liability notwithstanding the employer's having nipped a hostile environment in the bud would also conflict with the premise of *Ellerth/Faragher*, founded in agency law, that a supervisor who creates a hostile environment is aided by his agency status with the employer in doing so. *See Faragher*, 524 U.S. 775, 800, 118 S.Ct. 2275, 2290, 141 L.Ed.2d 662. Where the company, on hearing a plaintiff's complaint about inappropriate sexual behavior, moves promptly to investigate and stop the harassment, it eradicates any semblance of authority the harasser might otherwise have possessed.

Finally, *Faragher*'s discussion of the avoidable consequences doctrine and an employee's duty to mitigate damages supports relieving the employer from liability in circumstances like those before us. *Faragher* explains the relevance of these concepts while discussing the prong of the affirmative defense that requires an employer to prove the employee's "unreasonable" failure to take advantage of company policies to avoid sexual harassment:

> If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.

*Id.* at 2292. *Faragher* implies that a plaintiff should not wait as long as it usually takes for a sexually hostile working environment to develop when the company has an effective grievance mechanism. If the plaintiff complains promptly, the then-incidental misbehavior can be stymied before it erupts into a hostile environment, and no actionable Title VII violation will have occurred. Applying the foregoing analysis to Indest's case, we hold that because she promptly complained of Arnaudet's ha-

rassing conduct, and because the company promptly responded, disciplined Arnaudet appropriately and stopped the harassment, the district court properly granted judgment as a matter of law to Freeman. Even if a hostile work environment claim had been stated, which is dubious, Freeman's prompt remedial response relieves it of Title VII vicarious liability.

*Id.* at 265–67.

■ Though the Tenth Circuit has specifically disagreed with the Fifth Circuit's holding in *Indest, see Harrison v. Eddy Potash, Inc.,* 248 F.3d 1014, 1024–26 (10th Cir.2001), this Court concludes that the principles relied upon by Judge Jones are correct. Where an employer receives an allegation of sexual harassment, and the employer was not previously on notice of the alleged harasser's prior like-conduct or propensity to act, and the employer promptly insulates the complainant from further harassment and promptly investigations the allegations, the employer is entitled to a judgment as a matter of law. Surely this is what Title VII expects of employers.

## V. Conclusion

IT IS THEREFORE ORDERED that the Defendant's Motion for Summary Judgment (Doc. # 18) be, and it is hereby, GRANTED. This case is dismissed on the merits with prejudice.

### *JUDGMENT*

On even date herewith, the Court entered a Memorandum Opinion and Order granting the Defendant's Motion for Summary Judgment. It is Ordered and Adjudged that the Plaintiff take nothing and that the action be dismissed on the merits.